# Supreme Court of Louisiana

The Opinions handed down on the **9th day of December, 2014**, are as follows:

**BY CLARK, J.**:

2014-O -1828     IN RE:  JUDGE J. ROBIN FREE (Judiciary Commission)

For the reasons assigned, it is ordered that Judge J. Robin Free be suspended without pay for thirty days for violating Canons 1, 2, 2A, 3A(4), 3A(6), and 6B(2) of the Code of Judicial Conduct and La. Const. art. V, § 25(C). Judge J. Robin Free is further ordered to reimburse and pay the Judiciary Commission of Louisiana the sum of $6,723.64 in costs.

12/09/14

SUPREME COURT OF LOUISIANA

NO. 2014-O-1828

IN RE: JUDGE J. ROBIN FREE

JUDICIARY COMMISSION OF LOUISIANA

**CLARK, Justice**

This matter comes before the Court on the recommendation of the Judiciary Commission of Louisiana (the "Commission") that respondent, Judge J. Robin Free of the 18th Judicial District Court, Parishes of West Baton Rouge, Iberville, and Pointe Coupee, be suspended without pay for thirty days and be ordered to reimburse and pay to the Commission $6,723.64 in hard costs. The Commission conducted an investigatory hearing, made findings of fact and conclusions of law and determined that Judge Free violated Canons 1, 2, 2A, 3A(4), 3A(6), and 6B(2) of the Code of Judicial Conduct and Article V, Section 25(C) of the Louisiana Constitution. After reviewing the record, we find all of the charges against Judge Free, except his failure to recuse in Count I, were proven by clear and convincing evidence and we accept the recommendation of discipline of the Commission that Judge Free be suspended without pay for thirty days and be ordered to reimburse and pay the Commission $6,723.64 in costs.

## FACTS AND PROCEDURAL HISTORY

Judge Free was elected in 1996 and assumed his office on January 1, 1997. He has served continuously since that time, and was recently reelected without opposition to a new six-year term which will commence on January 1, 2015. In February 2013, the Commission filed Formal Charge 0314 against Judge Free, consisting of two counts of alleged misconduct. After Judge Free answered the

Formal Charge, Judge Patrick Schott was appointed as a hearing officer to conduct proceedings in this matter pursuant to Supreme Court Rule XXIII, § 29. Following the hearing, the Hearing Officer filed a report with the Commission containing proposed findings of fact and conclusions of law. Thereafter, the Commission established a briefing schedule, as required by Supreme Court Rule III, § 29, and ordered Judge Free to appear on April 25, 2014 for questioning by the Commissioners. On August 26, 2014, the Commission filed its recommendation in this court, finding that the Formal Charge was proven by clear and convincing evidence and recommending that Judge Free be suspended without pay for thirty days.

### *Count I*

This charge pertains to allegations that Judge Free engaged in improper *ex parte* communications with counsel for a party in an environmental contamination class action lawsuit, and improperly handled a request to recuse himself from the case due to his mother's status as a class member.

In 2001, a class action petition for damages was filed in the case captioned *Noretta Thomas, et al. v. A. Wilbert & Sons, LLC, et al.*, No. 55,127 on the docket of the 18th JDC. Plaintiffs alleged that the wells which provided drinking water to residents of the Myrtle Grove Trailer Park, located in Plaquemine, Louisiana, were contaminated by vinyl chloride. One of the defendants in the *Thomas* class action, The Dow Chemical Company, was represented by attorney F. Barry Marionneaux and his son and law partner, F. Charles Marionneaux. Dow's general counsel, Karen Eddlemon, was lead counsel for Dow and was responsible for overseeing Dow's defense in the *Thomas* class action.

2

On August 2, 2007, Judge Free signed a judgment on class certification that defined the *Thomas* class boundary by reference to certain plume maps introduced in the class certification hearing. It is undisputed that Judge Free's mother, Gloria Cedotal, does not reside or own immovable property within the boundary referenced in this judgment. On August 13, 2007, plaintiffs filed a motion for new trial, seeking to amend the class certification judgment to reflect which sub-class each class representative represented. On August 20, 2007, Judge Free issued an order vacating the August 2, 2007 judgment pending further proceedings.

Thereafter, on August 29, 2007, Judge Free signed a second judgment on class certification. While Judge Free believed that this judgment only addressed the issue of sub-classes of plaintiffs, the judgment also omitted the reference to the plume maps contained in the August 2, 2007 judgment, modified the western boundary, and changed the southern boundary of the *Thomas* class.[1] Ms. Cedotal owns and resides

---

[1] Multiple witnesses testified during the hearing about the exclusion of the plume maps from the second judgment. Two opposing views emerged:

(a) The first view is that the August 29, 2007 judgment (which did not reference the maps) adequately reflected the desire of at least one party to bring consistency and clarity to the *Thomas* class action. This view is best expressed by Dow attorney David Bienvenu, who stated that there were many reasons why both Dow and the plaintiffs wanted the plume maps eliminated from the August 29, 2007 judgment. Primarily, according to Mr. Bienvenu, the maps only represented a snapshot in time and therefore did not necessarily represent all affected plaintiffs. This is significant, according to Mr. Bienvenu, since it provides a primary motivation for both plaintiff and defendant to change the August 2, 2007 judgment. The obvious benefit to the plaintiffs would be additional class members. On the other hand, according to Mr. Bienvenu, the inclusion of a broader class area would provide a "res judicata effect" to a larger class of individuals, thereby preventing possible other suits against Dow at a later period of time.

(b) The second view is that the exclusion of the maps from the August 29, 2007 judgment was a huge mistake on the part of the plaintiffs. This view is best expressed by Adele Owen, who served as counsel for the plaintiffs in *Thomas* and served as an associate of Robert Schmolke (who was liaison counsel on the plaintiff steering committee). Ms. Owen was "stunned" to find out that the maps were not included in the August 29, 2007 judgment. According to her testimony, the maps were absolutely essential and their exclusion rendered the class definition "completely inadequate," as the maps dictated who was actually contaminated.

After considering all of this testimony, the Hearing Officer found, and the Commission agreed, that the omission of the plume maps from the August 29, 2007 judgment "was more likely than not a mistake," although he noted this finding does not "disprove the statements of Mr. Bienvenu that, at least for Dow, the exclusion of the plume maps would have actively been pursued for its larger 'res judicata effect.'"

in a house located on immovable property located at 57810 Orange Drive in Plaquemine, and she also owns the property located at 57811 Orange Drive. This residence and these properties are located within the geographic description of the class boundaries set forth in the August 29, 2007 class certification judgment signed by Judge Free.

In November 2009, Barry Marionneaux was investigating sources of groundwater contamination in areas of North Plaquemine. While looking at a well on Orange Drive, it occurred to him that Judge Free's grandparents lived on Orange Drive, and that Judge Free's mother must live in the general area.[2] After verifying that his recollection was in fact true, Barry Marionneaux shared this information with Dow's other attorneys and then contacted and met with Patrick Pendley, one of the plaintiffs' lead counsel, to discuss the situation.[3]

On December 1, 2009, Barry Marionneaux wrote a letter to Judge Free to advise that the issue of his recusal was being raised due to his mother's status as a class member and party within the meaning of La. Code Civ. P. art. 151(A)(3).[4] Mr. Marionneaux's letter advised that it was Dow's understanding that Ms. Cedotal resided within the class boundaries as set forth in the August 29, 2007 class certification judgment, which had become final on October 2, 2009, when writs were denied by this court.[5] The letter concluded by stating, "[i]f you have any questions or need anything further from us, please do not hesitate to call." Copies of Mr.

---

[2] Barry Marionneaux had drafted wills for Judge Free's grandparents in 1999 which made reference to their residence on Orange Drive, among other property. Mr. Marionneaux testified that he had no memory of knowing where Judge Free's mother resided at that time.

[3] Mr. Pendley testified that he did not recall Barry Marionneaux raising the recusal issue with him or meeting with him at that time.

[4] La. Code Civ. P. art. 151 provides in pertinent part that a judge shall be recused when "the judge's parent, child, or immediate family member is a party or attorney employed in the cause."

[5] *Thomas v. A. Wilbert & Sons, LLC*, 09-1435 (La. 10/2/09), 18 So. 3d 125.

Marionneaux's letter to Judge Free were delivered to opposing counsel via e-mail and he requested, on behalf of Dow, that an expedited status conference be scheduled to address the issues raised therein.

After receiving Barry Marionneaux's letter, Judge Free did not schedule a status conference, but instead telephoned Mr. Marionneaux to discuss the recusal issue and his mother's status as a party. Barry Marionneaux was not available, so Judge Free spoke with Charles Marionneaux. During this conversation, Judge Free was upset and expressed his opinion that this was a low move and a "cheap shot" by Dow.[6] He also insisted that his mother was not a class member or a party to the *Thomas* suit for the purposes of recusal within the meaning of La. Code Civ. P. art. 151(A)(3), despite the fact that her residence and properties were located within the geographic description of the class boundaries as set forth in the August 29, 2007 class certification judgment.

Shortly thereafter, according to the testimony of Charles Marionneaux, Judge Free again telephoned him and stated that he had spoken to Mr. Pendley about the recusal issue, and that Mr. Pendley had said Judge Free's mother's property was not located in a contaminated area. For his part, Judge Free said he told Charles Marionneaux that the matter "could be resolved very easily by discussion with plaintiff's counsel and, if necessary, revision of the class definition…" In his testimony, Mr. Pendley denied speaking to Judge Free as recounted by Charles Marionneaux. Judge Free stated that he did attempt to telephone Mr. Pendley but that

_____

[6] Judge Free suspected that Dow had an improper motive for raising the recusal issue at that time because (1) the original petition in *Thomas* had been filed approximately nine years earlier, and he had presided over the case the entire time; (2) the class certification hearing had taken place some two and a half years earlier; (3) he believed the location of his mother's residence had long been known by defense counsel; and (4) he believed the true purpose for the letter was either to upset a recently set trial date or "judge shopping."

he did not recall speaking with him.[7]

On December 1, 2009, after receiving Judge Free's telephone calls regarding the recusal issue, Charles Marionneaux reported the calls and the substance of Judge Free's comments to Ms. Eddlemon and the Dow litigation team. Dow filed a motion for recusal on December 4, 2009, after Judge Free declined to schedule a status conference and informed Charles Marionneaux that he would not self-recuse. On December 14, 2009, Ms. Eddlemon filed a complaint against Judge Free with the Commission. On February 3, 2010, a recusal hearing was held before Judge James Best, following which Judge Best granted Dow's motion to recuse Judge Free.

In Count I of the Formal Charge, the Commission alleges that Judge Free's conduct as set forth above violated Canons 1 (a judge shall uphold the integrity and independence of the judiciary), 2A (a judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary), 3A(4) (a judge shall perform judicial duties without bias or prejudice), 3A(6) (except as permitted by law, a judge shall not permit private or ex parte interviews, arguments, or communications designed to influence his judicial action in any case), and 3C (a judge shall disqualify himself in a proceeding in which disqualification is required by law) of the Code of Judicial Conduct. The Commission also alleged that Judge Free engaged in willful misconduct relating to his official duty and persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, all in violation of La. Const. art. V, § 25(C).

In his answer to the Formal Charge, Judge Free admitted that his mother resides within the "imprecise general description" of the *Thomas* class boundaries set forth

---

[7] Given this testimony, the Commission adopted the Hearing Officer's determination that no conclusion could be reached as to whether an *ex parte* communication took place between Mr. Pendley and Judge Free.

6

in the August 29, 2007 judgment, but he pointed out that a "precise" definition in the signed judgment "would have and should have included a reference to the maps" referenced in the August 2, 2007 class certification judgment. He also acknowledged that in hindsight, he should not have accepted the "invitation" in Barry Marionneaux's letter to call him, and that his telephone call to Barry Marionneaux, and his conversation with Charles Marionneaux, were "ill-advised." Judge Free conceded that his *ex parte* communication with Charles Marionneaux violated Canon 3A(6) of the Code of Judicial Conduct.

The Commission voted to adopt all of the proposed factual findings made by the Hearing Officer regarding Count I, which are summarized above. In addition, the Commission adopted specific proposed conclusions of fact made by the Hearing Officer, including the following: (1) the plume maps did not include the home owned by Judge Free's mother, and thus she was not a member of the class according to the August 2, 2007 judgment; (2) because the maps were excluded, the class description in the August 29, 2007 judgment clearly indicates that Judge Free's mother is a class member; (3) Judge Free knew or certainly should have known that his mother lived within the class boundary on December 1, 2009 when he received Barry Marionneaux's letter; and (4) Dow's motivations in seeking the recusal of Judge Free are irrelevant to the issue of Judge Free's judicial misconduct.

The Commissioners made additional findings of fact relative to Count I based upon their questioning of Judge Free and examination of the evidence introduced at the hearing. Briefly, these findings may be summarized as follows:

At his appearance before the Commission, Judge Free maintained that his mother was not a member of the *Thomas* class as that class was described in the August 29, 2007 judgment and that the August 2, 2007 and August 29, 2007

judgments described the same geographical area. Judge Free testified that the omission of the reference to the plume maps in the August 29, 2007 judgment did not change the geographical area of the class because the class area in that judgment was still "generally described as" bounded by certain areas. Judge Free maintained that this language had to be interpreted in light of the history of the case, in which all the parties understood and acted as if the class area was depicted in the plume maps, both before and after the signing of the August 29, 2007 judgment. Judge Free acknowledged, however, that, based on the language in the August 29, 2007 judgment alone, his mother's property was located in the area described by the judgment.

At his appearance before the Commission, Judge Free acknowledged that, if the parties disputed whether the omission of the reference to the plume maps from the August 29, 2007 judgment was intentional or inadvertent, then the judgment could have only been amended through a contradictory hearing.[8] Judge Free further admitted that he would have been unable to preside over such a hearing if it involved a determination as to whether his mother was a class member. Judge Free stated: "So in this case ..., if they'd have said we have to make a determination is your mother in or out, I would not have been comfortable with that and I would not have done that." Judge Free then stated: "If we had to decide was this a mistake that was made and it should've never happened, I would've [had] no trouble deciding that, if that makes any sense."

Finally, since being formally charged, Judge Free has admitted and conceded that his telephone call to Charles Marionneaux was an improper and ill-advised *ex*

---

[8] On December 7, 2009, three days after Dow filed its motion to recuse Judge Free, the plaintiffs filed a motion to amend the class definition in the August 29, 2007 judgment to reinstate the class definition contained in the August 2, 2007 judgment. This motion did not indicate that it was unopposed, and it appears that Dow intended to dispute that the omission of the reference to the plume maps from the August 29, 2007 judgment was a mere clerical error. Judge Free did not address the motion to amend the class definition because the motion to recuse was pending against him when it was filed. Judge Free testified that he did not believe the motion to amend the class definition was ever set for a hearing or ruled upon by any judge.

*parte* communication in violation of Canon 3A(6). Judge Free initiated the telephone call to Charles Marionneaux in response to Barry Marionneaux's letter raising the recusal issue. At his appearance before the Commission, Judge Free expressed regret about making the telephone call and not scheduling a status conference as requested. Judge Free explained that he has instituted office procedures so that this type of *ex parte* communication does not recur and assured the Commission members that such improper communications would not occur again.

The Commission voted to adopt all of the Hearing Officer's proposed conclusions of law regarding Count I. The Commission also reached additional conclusions of law. Briefly, the legal conclusions may be summarized as follows:

The Hearing Officer concluded that Judge Free violated Canon 3C by failing to disqualify himself in the *Thomas* suit. The August 29, 2007 judgment listing the class description clearly sets the eastern boundary at the Mississippi River, which unambiguously encompasses Judge Free's mother's home. When viewed alone, however, Judge Free's failure to self-recuse is somewhat tempered by the facts and complications surrounding the *Thomas* suit; most notably, that the class description and thus Judge Free's mother's status as a class member was likely the result of a mistake made by the plaintiffs.

The Commission found this conclusion by the Hearing Officer is buttressed by Judge Free's admissions that: (1) the parties disputed whether the omission of the reference to the plume maps from the August 29, 2007 judgment was intentional or inadvertent, notwithstanding Judge Free's belief that it was a simple mistake; and (2) in the face of such a dispute, a contradictory hearing would be required to determine whether the judgment should be amended. Judge Free could not have permissibly presided over a contradictory hearing on whether the August 29, 2007 judgment

9

should be amended because the class description in the judgment unambiguously included Judge Free's mother's home and a decision to amend the class description to include a reference to the plume maps would have the effect of excluding Judge Free's mother's home. Any decision regarding whether or not to amend the August 29, 2007 judgment would implicitly involve a decision regarding whether Judge Free's mother was a member of the class. This is especially so given that the impetus of the plaintiffs' effort to amend the class description was Barry Marionneaux's December 1, 2009 letter raising the recusal issue based on Judge Free's mother's status as a class member under the August 29, 2007 judgment. Even Judge Free admitted that he could not permissibly determine the issue of whether his mother was a member of the class.

Accordingly, the Commission concluded that Judge Free should have recused himself in response to Barry Marionneaux's December 1, 2009 letter, at which time it should have been apparent to Judge Free that his mother was a class member under the plain language of the August 29, 2007 judgment, that Dow would dispute that the omission of the plume maps was a mere clerical error, and that, even if the language of the judgment was in fact an error, he could not permissibly make the decision regarding whether it ought to be amended.

Judge Free did not know about the mistake made in the August 29, 2007 judgment until he was informed via letter on December 1, 2009. Nevertheless, Judge Free violated Canons 1, 2A, 3A(4), and 3A(6) of the Code of Judicial Conduct in his failure to self-recuse in the *Thomas* class action suit. More specifically, Judge Free's *ex parte* communications with counsel prior to a recusal decision along with his attempt to "resolve" the matter infused bias into his judicial decisions related to the *Thomas* suit. In fact, Judge Free's actions by themselves became an independent

basis for his recusal in accordance with Canon 3C through his biased actions against Dow Chemical.

Judge Free has essentially argued that the *ex parte* conversations as well as his other activities after receiving the December 1, 2009 letter should be judged separately from the underlying recusal issue. This is especially true, according to Judge Free, since he truly believed that his mother was not a party. Nevertheless, the two instances of misconduct, his failure to recuse and his post-letter conduct, are inextricably linked together. Judge Free only participated in the *ex parte* conversations upon receiving the letter correctly pointing out that his mother was a party in accordance with the judgment. Thus, the entire sequence of events leading to the failure to self-recuse supports the conclusion that Judge Free engaged in willful misconduct relating to his official duty and persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, in violation of La. Const. art. V, § 25(C).

The Office of Special Counsel ("OSC") argued that Judge Free "fail[s] to comprehend the significance and effect of his own judicial actions" by maintaining throughout the hearing that Dow acted in bad faith. The class description of August 29, 2007 makes clear that Dow's counsel had a legitimate argument that it was advancing on behalf of its client. In fact, one could argue that Dow's counsel may have even had an ethical obligation to advance that argument to protect its client. As such, Judge Free should have considered the argument impartially without publicly questioning Dow's motives or attempting to cure the matter. Because of Judge Free's focus on Dow's motives instead of his own actions, the Commission agreed with the Hearing Officer and the OSC that Judge Free "fail[s] to comprehend the significance and effect of his own judicial actions."

11

### Count II

This charge pertains to allegations that in April 2010, Judge Free accepted an invitation to participate in an all-expenses-paid trip on a private jet to a hunting ranch in Texas, extended to him by attorneys in a personal injury case before him at or near the time of settlement negotiations, including an attorney who regularly tries cases in his court, and which trip occurred shortly after the trial was concluded. The Commission received an anonymous complaint concerning this trip in August 2010.

Judge Free presided over a personal injury case captioned *Leslie Robles, et al. v. Integrated Production Services, et al.*, No. 65,632 on the docket of the 18th JDC. The plaintiff, Israel Robles, and his wife, Leslie, filed suit to recover damages for Mr. Robles' injuries caused in an oil field accident. The plaintiffs were represented by David Rumley and Joe Ritch of the Corpus Christi, Texas law firm of Wigington, Rumley, Dunn & Ritch. Mr. Rumley associated Port Allen attorney Antonio "Tony" Clayton as local counsel in the *Robles* case. Mr. Clayton is an Assistant District Attorney for the 18th JDC, as well as a private attorney, and regularly appears before Judge Free as counsel of record in various civil and criminal cases.

On Wednesday, March 24, 2010, midway through a jury trial, the *Robles* case settled for $1.2 million. The settlement was read into the record before Judge Free.

On Thursday, April 1, 2010, Judge Free, Mr. Clayton, Cleo Fields, and Bert Clement[1] traveled to the Casa Bonita Ranch, which is owned by Mr. Rumley. The ranch is located in Goliad County, Texas, about one hour northeast of Corpus Christi. Judge Free went on the trip at the invitation of Mr. Clayton. Judge Free is well known in the community for his expertise regarding wildlife management, hunting,

---

[1] Mr. Clement has been a friend of Judge Free since junior high school, and they frequently hunt together. Mr. Clement currently serves as a misdemeanor probation officer in the 18th JDC and is assigned primarily to Judge Free's section of court. Nevertheless, when Judge Free was asked during his sworn statement to name the men who accompanied him on the Texas trip, he referred to Mr. Clement as "another guy" whose "name was Bert or something like that."

and the suitability of hunting camps, and he contends he accompanied Mr. Clayton to the Casa Bonita Ranch solely to provide his advice and counsel to Mr. Clayton, who was considering whether to purchase the ranch, which was for sale. The group flew to the ranch in a private jet owned by Mr. Rumley's law firm, although Judge Free maintains he had been unaware of these arrangements prior to the group's departure, and had thought they were driving to Texas instead. Judge Free did not incur any expenses in connection with the flight.

After viewing the ranch on the first day, Mr. Clayton knew he would not buy it and decided to return home. Prior to leaving the ranch, he boiled some crawfish which he and Judge Free had brought from Louisiana for the trip. Mr. Clayton and Mr. Fields then went back to Corpus Christi and checked into a hotel; the next morning, they rented a car and returned to Louisiana.

Meanwhile, according to Judge Free's testimony, Judge Free was unaware that Mr. Clayton had left the ranch and not returned. The first night, Judge Free stayed at the Casa Bonita Ranch house free of charge. On the second day, Friday, April 2, 2010, Judge Free and Mr. Clement were transported to Mr. Rumley's new hunting ranch in George West, Texas, where they stayed in a temporary modular home, a three-bedroom trailer, free of charge. While at the second ranch, Judge Free, Mr. Clement, Mr. Rumley, and Mr. Rumley's father took Mr. Rumley's young son on a turkey hunt. Judge Free and Mr. Clement "called" a turkey, which the boy shot. The men also boiled the rest of the crawfish which Mr. Clayton and Judge Free had brought from Louisiana. On the morning of the third day, Saturday, April 3, 2010, Judge Free and Mr. Clement were transported to the airport and flown home free of charge in Mr. Rumley's firm's jet.

In Count II of the Formal Charge, the Commission alleges that Judge Free's conduct as set forth above violated Canons 1, 2 (a judge shall avoid impropriety and the appearance of impropriety in all activities), 2A, and 6B(2) (2010 version) (except as otherwise provided in Canon 6B(3) and 6B(4), a judge shall not accept, directly or indirectly, any gifts, loans, bequests, benefits, favors, or other things of value if the source is a party or other person, including a lawyer, who has come or is likely to come before the judge, or whose interests have come or are likely to come before the judge) of the Code of Judicial Conduct. The Commission also alleged that Judge Free engaged in willful misconduct relating to his official duty and persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, all in violation of La. Const. art. V, § 25(C).

In his answer to the Formal Charge, Judge Free admitted that he did not pay the expenses of the trip to Texas but denied the trip constituted an improper gift or thing of value because "the sole purpose for the trip was to accompany Mr. Clayton to advise him as to the propriety of purchasing the Casa Bonita Ranch." However, Judge Free subsequently admitted that his conduct violated Canons 2A and 6B(2) and warranted a public censure recommendation by the Commission to this court.

The Commission voted to adopt most of the proposed factual findings made by the Hearing Officer regarding Count II, which are summarized above. However, the Commission did not agree with the Hearing Officer's finding that Mr. Clayton invited Judge Free on the Texas trip **during** the trial and/or settlement negotiations in the personal injury case. Rather, the Commission found clear and convincing evidence that Mr. Clayton invited Judge Free on the trip **at or near the time of the settlement negotiations** in the personal injury case. The Commission also did not agree with the Hearing Officer that the testimony of the trip's participants that Judge Free went on

14

the trip solely to advise Mr. Clayton as to the suitability of the Texas ranch for possible purchase by Mr. Clayton was "concocted after-the-fact" to protect Judge Free. The Commission agreed with the Hearing Officer that the testimony of the trip's participants was not entirely credible, however. The Commission likewise agreed with the Hearing Officer that Judge Free's testimony lacked candor and credibility, particularly in light of his reference to Mr. Clement, his childhood friend and hunting partner, as "another guy" whose "name was Bert or something like that." The Commission concurred in the Hearing Officer's assessment that such testimony calls into question the veracity of Judge Free's sworn statement and "diminishes his credibility in general."

The Commission made additional findings of fact relative to Count II based upon their questioning of Judge Free and examination of the evidence introduced at the hearing. Briefly, these findings may be summarized as follows:

There is no evidence or allegation that Judge Free's acceptance of the invitation to go on the Texas trip in any way affected his judicial decision-making in the *Robles* case.

Although Judge Free contended throughout the hearing that the Texas trip was not ethically improper because he merely accompanied Mr. Clayton to advise him as to the suitability of the ranch and thus received no benefit, Judge Free later acknowledged in post-hearing proceedings before the Commission that the Texas trip was ethically improper and that he did in fact receive a benefit from the trip.[2] Judge

_____

[2] Before the Commission, Judge Free concurred in Mr. Clayton's assessment that the Texas trip "was just some friends going to look at some property together and boiling crawfish and hanging out." Judge Free testified:

> But looking back through this process of going through this where it says you should not receive a benefit, you should not receive anything of value, I realize that's a violation. Whether I went and carried water for him, I still got a benefit of liking to be there. I like that. I do enjoy that kind of stuff. . . . Looking at the property . . . [i]t's tough, but I do enjoy doing it. So it is also fun[.] . . . [T]he sitting around, the boiling crawfish, that was fun. I enjoyed that.

Free also accepted responsibility for his actions, apologized for his misconduct in taking the Texas trip, and assured the Commission that such misconduct will never be repeated.

The Commission voted to adopt the Hearing Officer's proposed conclusions of law regarding Count II. The Commission also reached additional conclusions of law. Briefly, the legal conclusions may be summarized as follows:

Judge Free accepted an invitation to participate in an all-expenses-paid trip on a private jet to a hunting ranch in Texas, extended to him by lawyers in a case before him at or near the time of settlement negotiations, including a lawyer who regularly tries cases in his court, and which trip occurred as soon as the trial was over. As such, by a clear and convincing standard, Judge Free violated Canons 1, 2, 2A, and 6B(2) of the Code of Judicial Conduct. Judge Free's defense, that he merely accompanied Mr. Clayton to advise him as to the suitability of the ranch, is not credible.

The former version of Canon 6B(2), in effect when the conduct took place, states in pertinent part that a judge shall not accept, directly or indirectly, any gifts, benefits, or other things of value if the source is a party or other person, including a lawyer, who has come or is likely to come before the judge. Obviously, Mr. Clayton is someone "who has come or is likely to come before" Judge Free. But Judge Free argues that when he accompanied Mr. Clayton to Texas he did not accept "any gift" or any "other thing of value" because he was there solely to advise Mr. Clayton about the purchase of the property. This argument is not supported by the evidence. First, the testimony of some of the trip's participants was not credible. Second, though

---

***

In other words, I wasn't thinking benefit. I was thinking for – was this done for my benefit. And – and while it was not, I did receive a benefit. And that is a violation in and of itself, and I realize that now. I just wish I'd have realized it then[.]

16

Judge Free may not have had a hunting license and may not have "hunted," it does not mean that he did not derive some benefit from the trip. Judge Free took a private plane with two people he described as friends, Mr. Clement and Mr. Clayton, to a hunting ranch. To paraphrase Mr. Clayton's testimony, he was there to hang out, boil crawfish, and shoot the bull. An avid hunter, Judge Free got to spend time surveying wildlife, calling turkeys, spending time outdoors, and even helping Mr. Rumley's son kill his first turkey. That he did not pick up a gun and kill an animal himself should not be the deciding factor in determining whether he derived some benefit.

Judge Free argued that Canon 5A allows a judge to engage in recreational activities if they do not detract from the dignity of office. But according to Canon 6A, "[a] judge may receive compensation and expenses for the quasi-judicial and extra-judicial activities permitted by this Code, if the source of such payments does not give the appearance of influencing the judge in his or her judicial duties *or otherwise give the appearance of impropriety.*" [Emphasis added.] The Commission agreed with the Hearing Officer that the the problem with Judge Free's argument is that the proximity of the trip in relation to the trial, as well as the discussion of the trip itself at or near the time of settlement negotiations, which clearly gives an appearance of impropriety. In this way, the Commission agreed with the Hearing Officer and the OSC that a "judge cannot claim to be an expert in some recreational activity as a way around the prohibition of receiving benefits and things of value from the lawyers who appear before him."

By accepting an invitation to participate in an all-expenses-paid trip on a private jet to a hunting ranch in Texas, extended to him by lawyers in a case before him at or near the time of settlement negotiations, including a lawyer who regularly tries cases in his court, and which trip occurred as soon as the trial was over, Judge

Free engaged in willful misconduct relating to his official duty and engaged in persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, in violation of La. Const. art. V, § 25(C).

## DISCUSSION

This court has original jurisdiction in judicial disciplinary proceedings. La. Const. Art. V, § 25(C). Therefore, this court has the power to make original determinations of fact based upon the evidence in the record and is not bound by, nor required to give any weight to, the findings and recommendations of the Judiciary Commission. *In re Quirk*, 97-1143, pp. 3-4 (La. 12/12/97), 705 So.2d 172, 175-76.

The standard of proof in judicial discipline cases is the clear and convincing standard. *In re Johnson,* 96-1866 p. 7 (La.11/25/96), 683 So.2d 1196, 1199; *In re Huckaby,* 95-0041 p. 6 (La.5/22/95), 656 So.2d 292, 296. This standard requires that the level of proof supporting the Commission's factual findings must be more than a mere preponderance of the evidence but less than beyond a reasonable doubt. *Id.*

In brief to this court and in oral argument, Judge Free concurred in all Findings of Fact and Conclusions of Law of the Judiciary Commission except with regard to the issue of his recusal as described in Count I, the alleged violation of Canon 3C. Accordingly, we pretermit discussion of the stipulated violations, agreeing in full with the relevant findings and conclusions made by the Commission in connection therewith, and focus instead on Judge Free's objection to the findings and conclusions surrounding his failure to recuse in Count I.

Judge Free contends the omission of the reference to the plume maps in the August 29, 2007 judgment was a mistake. The August 29, 2007 judgment was only meant to address the issue of subclasses and was not intended to modify any of the outside borders of the overall *Thomas* class. He points to the lengthy history of the

18

case to support his contention that all parties at all times referenced the plume maps in describing the class area. Judge Free avers that from 2001 when the *Thomas* litigation began to late 2009 when the letter requesting Judge Free's recusal was drafted by Dow, no one believed that Judge Free's mother lived inside the class area. Thus, Judge Free speculates some improper motive on behalf of Dow for challenging Judge Free's involvement in the matter.

In particular, Judge Free questioned the timing of Barry Marionneaux's memory of the location of Judge Free's grandparents' house and the discovery of his mother's house. He avers Barry Marionneaux drafted his grandparents' wills in 1999 and the wills memorialized their address.[3] Furthermore, Judge Free explains that Barry Marionneaux knew him and his family in a social context for decades. Thus, Judge Free states Barry Marionneaux "actually in fact knew (or should have known) since at least 1999 where both Judge Free's grandparents and mother resided." Barry Marionneaux testified that his "memory came up" in late November 2009 that Judge Free's family members lived on Orange Drive. Judge Free posits that this sudden memory corresponds with an October 21, 2009 status conference in the *Thomas* case, wherein Judge Free set a trial date for April 1, 2010, to which Dow objected. Judge Free, then, argues that the issue of his possible recusal was not raised for approximately eight years and only surfaced to upset a unfavorable trial date.

Furthermore, Judge Free cites to Dow's continued use of and reference to the plume maps through November 13, 2009, two weeks prior to seeking his recusal. These illustrations of Dow's actions and alleged bad faith are used by Judge Free for two purposes: (1) to counter the charge in Count I that "prior to the final certification of the class, [he] had not disclosed the fact that [his] mother resided in the geographic

---

[3] Judge Free's mother, Gloria Cedotal, owns her home and the home in which her parents resided across the street.

19

area designated by the court in defining and certifying the class" and (2) to explain why he did not accept at face value Barry Marionneaux's letter of December 1, 2009, which claimed that the class boundaries were different and that Judge Free's mother lived within the new boundaries, thereby necessitating his recusal.

First, we agree with the Commission that there is no merit to Judge Free's contention that the "linchpin" of Count I is his intentional non-disclosure prior to the final certification of the class in the August 29, 2007 judgment. A full reading of Count I of the Formal Charge shows that the primary components of the charge against Judge Free are his actions and inactions after receiving the December 1, 2009 letter. Specifically the Formal Charge provides, in pertinent part:

> On or about December 1, 2009, after receiving this letter, instead of having your staff schedule an expedited status conference with counsel for the parties, you telephoned Barry Marionneaux to discuss the recusal issue and your mother's status as a party. You were upset and believed Dow was up to something improper. Barry Marionneaux was not available, so you engaged in an ex parte conversation with his son and law partner, Charles Marionneaux.

> During your conversation with Charles Marionneaux, you addressed the merits of the recusal motion and your opinion that Dow had some untoward motive for raising the recusal issue at that time. Prior to the final certification of the class, you had not disclosed the fact that your mother resided in the geographic area designated by the court in defining and certifying the class.

> Previously, you, Judge J. Robin Free, on August 29, 2007 had signed a Judgment on Class Certification that defined the *Thomas* class with precise boundaries. Your mother owns and resides in immovable property located at 57810 Orange Drive, Plaquemine, Louisiana and also owns the property located at 57811 Orange Drive, Plaquemine, Louisiana. Despite the fact that your mother's residence and properties are located within the geographic description of the class boundaries set forth in the class Judgment you entered, you insisted to Charles Marionneaux that your mother was not a class member or

20

> a party to the suit for the purposes of recusal within the meaning of La. Code of Civ. Procedure Art. 151(A)(3).
>
> . . .
>
> Shortly after this ex parte conversation with Patrick Pendley, you again telephone[d] Charles Marionneaux and informed him that you had spoken to Mr. Pendley, had discussed the merits of the recusal motion, and were of the opinion that your mother was not a party. You stated you had no intention of recusing yourself, and also suggested options that could eliminate the grounds for recusal, so that Dow would not have to file a Motion to Recuse.

We do not find the Formal Charge alleges that Judge Free knew all along that his mother was a member of the *Thomas* class and failed to disclose the information. Rather, we find the Formal Charge focuses on his post-December 1, 2009 conduct. Even assuming *arguendo* that the Formal Charge alleged such misconduct, we do not find it was proven by clear and convincing evidence. Indeed, we agree with the Commission that the exclusion of the plume maps was likely a mistake. However, we must analyze Judge Free's conduct *after* he received the December 1, 2009 letter.

Judge Free acknowledged that based on the language of the August 29, 2007 judgment, his mother's property was located within the class area. However, based on the long history of the case and the earnest belief that the class description was the result of a mistake, we do not find that self-recusal was mandated upon the receipt of the December 1, 2009 letter. When Judge Free initially declined to self-recuse, a motion by Dow had not yet been filed. Notably, upon the filing of Dow's Motion for Recusal on December 4, 2009, Judge Free referred the motion to another judge.

La.Code Civ.P. art. 154, in relevant part, states: "[i]f a valid ground for recusation is set forth in the motion, the judge shall *either* recuse himself, or refer the motion to another judge. . ." (Emphasis added). Thus, Judge Free's course of action was fully sanctioned by the Louisiana Code of Civil Procedure. Accordingly, even

21

if the additional alleged grounds[4] for recusal were proven, we find no error in the procedure chosen by Judge Free to address Dow's recusal motion based on the unique facts of this case. Accordingly, we find the Commission did not prove a violation of Canon 3C by clear and convincing evidence.

Last in our discussion of the Formal Charge, we note the Hearing Officer and the Commission found Judge Free's testimony as to Count II and the Texas trip, in some regards, lacked candor and credibility. We agree and further concur in the Commission's assessment that such testimony "diminishes his credibility in general."

Thus, after reviewing the record and the applicable law, we find that Judge Free's conduct as set forth by the Formal Charge was proven by clear and convincing evidence in violation of Canons 1, 2, 2A, 3A(4), 3A(6), and 6B(2) (2010 version) of the Code of Judicial Conduct and La.Const. Art. V § 25 (C) but not in violation of Canon 3C.

## DISCIPLINE

In recommending discipline, the Commission looked to the factors set forth by this court in *In re: Chaisson*, 549 So.2d 259 (La. 1989).[5] We adopt the conclusions reached by the Commission and find as follows:

---

[4] The Commission further alleged recusal was necessitated because (1) Judge Free could not have permissibly presided over a contradictory hearing to determine whether the August 29, 2007 judgment needed to be amended and (2) Judge Free's act of calling Dow's letter a "cheap shot" infused bias into his judicial decision in the *Thomas* case and served as cause for his impartiality to be reasonably questioned.

[5] In *Chaisson*, this court, citing *Matter of Deming*, 108 Wash.2d 82, 736 P.2d 639, 659 (1987), set forth a non-exclusive list of factors a court may consider in imposing discipline on a judge:

(a) whether the misconduct is an isolated instance or evidenced a pattern of conduct; (b) the nature, extent and frequency of occurrence of the acts of misconduct; (c) whether the misconduct occurred in or out of the courtroom; (d) whether the misconduct occurred in the judge's official capacity or in his private life; (e) whether the judge has acknowledged or recognized that the acts occurred; (f) whether the judge has evidenced an effort to change or modify his conduct; (g) the length of service on the bench; (h) whether there have been prior complaints about this judge; (i) the effect the misconduct has upon the integrity of and respect for the judiciary; and (j) the extent to which the judge exploited his position to satisfy his personal desires.

(a) and (b) Judge Free has previously been admonished or cautioned in the past by the Commission for misconduct, including: (1) engaging in impermissible *ex parte* communications designed to influence his judicial action in a case; (2) creating the appearance of impropriety by words or conduct in the performance of his judicial duties; and (3) failing to recuse himself. The conduct upon which these cautions and admonishments were based, however, occurred most recently in 2003, over ten years ago, with a significant portion of the events occurring in 1998 and 1999, some fifteen years ago, shortly after Judge Free took office in 1997.

(c) and (d) With respect to Count I, Judge Free's misconduct occurred in the context of a case – the *Thomas* class action. The *ex parte* conversation and Judge Free's subsequent actions, while not occurring in the courtroom, did occur in his official capacity as a district court judge. With respect to Count II, although Judge Free's travel to and stay at Rumley's ranch in Texas occurred outside of the courtroom, the Commission found that Judge Free accepted Tony Clayton's invitation to go on the trip at or near the time of settlement negotiations in the *Robles* case that was before him.

(e) and (f) With respect to the improper *ex parte* communication in Count I, since being formally charged, Judge Free has acknowledged and recognized that his telephone call to Charles Marionneaux was an improper and ill-advised *ex parte* communication in violation of Canon 3A(6). Judge Free has detailed his efforts to modify his conduct to avoid impermissible *ex parte* communications in the future. He has instituted office procedures such that: (1) his law clerk screens his phone calls, and he will refuse to talk to any attorney or party about a case *ex parte*; and (2) any letter received by his chambers from a party in a case will be stamped, filed with the clerk, and set for a status conference or contradictory hearing.

With respect to the Texas trip in Count II, Judge Free has now admitted that his actions constituted ethical misconduct. Judge Free, however, did not recognize that his actions were ethically improper until after the hearing officer issued his proposed findings of fact and conclusions of law. Having realized why his actions in this regard were improper, Judge Free apologized to the Commission for his misconduct in taking the trip to Texas and assured the Commission that such misconduct will never be repeated.

Additionally, Judge Free's lack of credibility and candor in aspects of his testimony regarding the Texas trip is relevant for purposes of considering disciplinary factors.

(g) Judge Free has held judicial office continuously since January 1, 1997. At the time these matters arose in December 2009 (Count I) and March 2010 (Count II), Judge Free was not a new judge and should have been more familiar with his ethical obligations pursuant to the Code of Judicial Conduct and the Louisiana Constitution.

(h) As set forth in detail above, there have been several prior complaints against Judge Free, all of which were resolved privately by the Commission.

(i) Judge Free's actions have harmed the integrity of and respect for the judiciary. With respect to Count I, after receiving a letter from an attorney in a case before him raising the issue of his recusal, Judge Free made an assumption about the attorney's motivations and improperly attempted to resolve the matter by engaging in an *ex parte* communication with the attorney's law partner in which Judge Free discussed the merits of the recusal issue and exhibited bias toward the party for raising the recusal issue.

With respect to Count II, Judge Free accepted an invitation to participate in an all-expenses-paid trip on a private jet to a hunting ranch in Texas, extended to him

24

by attorneys in a case before him at or near the time of settlement negotiations, including an attorney who regularly tries cases in his court, and which trip occurred shortly after the trial was concluded. Judge Free admitted that this conduct tarnished the integrity of and respect for the judiciary.

(j) With respect to Count I, there is no evidence that Judge Free exploited his position to satisfy his personal desires. With respect to Count II, however, Judge Free did exploit his position to satisfy his personal desires. Judge Free admitted that the trip was enjoyable and that he received a benefit from it.

After considering the *Chaisson* factors, some of which may be regarded as aggravating and some as mitigating, we accept the recommendation of the Commission and suspend Judge Free without pay for thirty days, as well as order him to reimburse and pay to the Commission $6,723.64 in hard costs.

**DECREE**

For the reasons assigned, it is ordered that Judge J. Robin Free be suspended without pay for thirty days for violating Canons 1, 2, 2A, 3A(4), 3A(6), and 6B(2) of the Code of Judicial Conduct and La. Const. art. V, § 25(C). Judge J. Robin Free is further ordered to reimburse and pay the Judiciary Commission of Louisiana the sum of $6,723.64 in costs.