# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE                                    NEWS RELEASE #036

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **29th day of June, 2016**, are as follows:

**BY GUIDRY, J.**:

2016-O -0434        IN RE: JUDGE J. ROBIN FREE, EIGHTEENTH JUDICIAL DISTRICT
                    COURT, PARISHES OF WEST BATON ROUGE, IBERVILLE, AND POINTE
                    COUPEE, STATE OF LOUISIANA

                    Upon review of the findings and recommendations of the Judiciary
                    Commission, and considering the record filed herein, we find the
                    record establishes by clear and convincing evidence that
                    Respondent violated Canons 1, 2, 2A, 3A(1), 3A(2), 3A(3), and 3C
                    of the Code of Judicial Conduct, as well as La. Const. art. V, §
                    25(C). Based on our review of the Chaisson factors and the law
                    applicable to this case, we find Respondent's misconduct
                    justifies the recommended sanction of suspension for one year
                    without pay. Accordingly, it is hereby ordered that Judge J.
                    Robin Free of the 18th Judicial District Court for the Parishes
                    of Iberville, Pointe Coupee and West Baton Rouge, be suspended
                    for a period of one year without pay.  Judge Free is further cast
                    with costs of this proceeding, and shall pay to the Judiciary
                    Commission the sum of $11,098.68 as reimbursement for expenses
                    incurred by the Commission during its investigation and
                    prosecution of this case, pursuant to Supreme Court Rule XXIII, §
                    22. SUSPENSION ORDERED.

                    WEIMER, J., dissents in part.
                    CLARK, J., dissents in part and would give lesser sentence.

**SUPREME COURT OF LOUISIANA**
**No. 2016-O-0434**
**IN RE:  JUDGE J. ROBIN FREE,**
**EIGHTEENTH JUDICIAL DISTRICT COURT,**
**PARISHES OF WEST BATON ROUGE, IBERVILLE,**
**AND POINTE COUPEE, STATE OF LOUISIANA**

**JUDICIARY COMMISSION OF LOUISIANA**

**Guidry, J.**

This judicial disciplinary proceeding was instituted by the Judiciary Commission of Louisiana ("Commission") against Judge J. Robin Free of the 18th Judicial District Court for the Parishes of Iberville, Pointe Coupee and West Baton Rouge.[1]  The Formal Charge authorized by the Commission alleged Judge Free violated the Code of Judicial Conduct and the Louisiana Constitution, Article V, § 25(C), in that he interrupted a private meeting between the family members of the victims and members of the District Attorney's Office, following a hearing in a criminal case before him, and made an inappropriate comment; abused his contempt authority and failed to follow the proper procedures for the punishment of contempt in two cases; and made inappropriate comments in seven criminal cases and exhibited a lack of proper decorum, demeanor, and temperament. After reviewing the recommendation of the Commission and the record, we find, by a clear and convincing evidence standard, that Judge Free violated Canons 1, 2, 2A, 3A(1), 3A(2), 3A(3), and 3C of the Code of Judicial Conduct, as well as Article V, Section 25(C) of the Louisiana Constitution (1974). The Commission has recommended that Judge Free be suspended without pay for a period of one year and be ordered to reimburse the Commission in the amount of $11,098.68. For the reasons set forth below, we accept the recommendation of the Commission.

---

[1] Judge Free was elected in 1996 and assumed his office on January 1, 1997. He has served continuously since that time.

1

**APPLICABLE LAW**

This court is vested with exclusive original jurisdiction in judicial disciplinary proceedings by La. Const. art. V, § 25(C), which provides in pertinent part:

> On recommendation of the judiciary commission, the supreme court may censure, suspend with or without salary, remove from office, or retire involuntarily a judge for willful misconduct relating to his official duty, willful and persistent failure to perform his duty, persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, conduct while in office which would constitute a felony, or conviction of a felony.

Pursuant to its supervisory authority over all lower courts, this court adopted the Code of Judicial Conduct, effective January 1, 1976, which supplements the Constitution's substantive grounds for disciplinary action against a judge. Violations of the Canons of the Code of Judicial Conduct, without more, may serve as the basis for the disciplinary action provided for by La. Const. art. 5, § 25(C). The charge against a judge must be proved by clear and convincing evidence before this court can impose discipline. *In re: Hunter,* 02-1975 p. 3 (La. 8/19/02), 823 So. 2d 325, 328.

**FORMAL CHARGES**

In June and as amended in December of 2014, the Judiciary Commission filed Formal Charge 0336 against Judge Free, (hereinafter "Respondent"), consisting of four counts of alleged misconduct.[2]

---

[2] Respondent filed exceptions and a motion to dismiss Counts Three and Four of the Formal Charge, alleging he had not been provided with adequate notice of the allegations set forth therein. The Commission granted respondent's exception of prematurity and his motion to dismiss, without prejudice to the Commission's right to reassert those counts after respondent had been given notice of the allegations and an opportunity to respond. After providing such notice and considering his response, Amended Counts Three and Four of the Formal Charge were filed in December 2014.

Count One of the Formal Charge alleged Respondent violated Canons 1, 2, 2A, 3A(1), 3A(4), 3A(6), and 3C of the Code of Judicial Conduct and La. Const. art. V, § 25(C) by interrupting a private meeting between the family members of the victims and members of the District Attorney's Office, following a hearing in a criminal case before him, and making inappropriate comments.[3]

Count Two and Amended Count Three alleged Respondent violated Canons 1, 2A, and 3A(1) of the Code of Judicial Conduct and La. Const. art. V, § 25(C) by abusing his contempt authority. Count Two alleged Respondent held Mr. Michael V. Owens in direct contempt of court and sentenced him to a term of imprisonment when Mr. Owens's conduct was not contemptuous and without following the proper procedures for the punishment of a direct contempt, including failing to give him an opportunity to be heard orally by way of defense or mitigation. Amended Count Three alleged Respondent held another misdemeanor defendant, Ebonique Minor, in direct contempt of court and sentenced her to a term of imprisonment also without following the proper contempt procedures.

Amended Count Four alleged Respondent violated Canons 1, 2A, 3A(2), and 3A(3) of the Code of Judicial Conduct and La. Const. art. V, § 25(C) by making inappropriate comments and exhibiting a lack of proper decorum, demeanor, and temperament in seven separate criminal cases.

A hearing officer was appointed to conduct proceedings in this matter pursuant to Supreme Court Rule XXIII, § 29. Following a hearing in January 2015, the Hearing Officer filed a report with the Commission containing proposed findings of fact and conclusions of law. Thereafter, the Commission established a

---

[3] Count One of the Formal Charge originally consisted of two separate allegations of misconduct, set forth in Paragraphs 1-3 and Paragraphs 4-8. Because the Commission disagreed with the Hearing Officer's finding that respondent had committed judicial misconduct with respect to Paragraphs 4-8, and thus made no recommendation to this court, we choose not to address Count One, Paragraphs 4-8, and will consider Count One as if it consists only of Paragraphs 1-3.

briefing schedule, as required by Supreme Court Rule XXIII, § 29, and ordered Respondent to appear on October 16, 2015 for questioning by the Commissioners. On March 9, 2016, the Commission filed its recommendation in this court, finding Respondent's conduct was in violation of the Code of Judicial Conduct and recommending he be suspended without pay for one year and be ordered to reimburse the Commission its costs. The matter was then heard by this court on May 3, 2016, pursuant to Supreme Court Rule XXIII, § 14. Due to the unrelated factual nature of three of the four counts, we will address each count in turn.

**Count One**

Count One arises out of a criminal case assigned to Respondent in 2010 and 2011. Attorney James Boren, who appeared before Respondent on behalf of a defendant charged with three counts of vehicular homicide, sent correspondence to the Judiciary Commission. Mr. Boren attached copies of pleadings alleging Respondent met *ex parte* with members of the District Attorney's Office and the victims' families after a hearing in the case, raising issues of bias, the appearance of impropriety, and failure to self-recuse.

Count One alleged Respondent violated Canons 1 (a judge shall uphold the integrity and independence of the judiciary), 2 (a judge shall avoid impropriety and the appearance of impropriety in all activities), 2A (a judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary), 3A(1) (a judge shall be faithful to the law and maintain professional competence in it), 3A(4) (a judge shall perform judicial duties without bias or prejudice; a judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice), and 3C (a judge should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned and shall disqualify himself or

4

herself in a proceeding in which disqualification is required by law or applicable Supreme Court rule) of the Code of Judicial Conduct. The Commission further alleged Respondent engaged in willful misconduct relating to his official duty and engaged in persistent and public conduct prejudicial to the administration of justice that brought the judicial office into disrepute, in violation of La. Const. art. V, § 25(C).

Respondent has now acknowledged the evidence is clear and convincing that his conduct violated Canons 1 and 2A when he entered the District Attorney's coffee lounge and made certain comments, as discussed in more depth below. He further agrees with the Commission that his conduct did not violate Canons 3A(4) and 3A(1). Respondent, however, disagrees with the Commission that his conduct violated Canon 3C, because he does not believe the evidence supports a finding that he should have recused himself after he had interrupted the meeting that is the subject matter of Count 1. Finally, Respondent agrees with the Commission that he did not engage in persistent and public conduct prejudicial to the administration of justice that brought the judicial office into disrepute in violation of La. Const. art. V, § 25(C). But he does concede that, because he exercised poor judgment in not immediately exiting the coffee lounge upon entering and in making the statement attributed to him by the District Attorney, he engaged in willful misconduct related to his official duty in violation of La. Const. art. V, § 25(C).

*Findings of Fact*

Our review of the record supports the factual findings of the Hearing Officer as adopted by the Commission, as well as the additional findings of the Commission. Those findings are summarized below.

In May 2009, Jerry Jordan was piloting a boat on the False River when he struck another boat, killing three young men and injuring a fourth. Mr. Jordan was

5

allegedly intoxicated at the time of the accident. In September 2009, Mr. Jordan was indicted by a grand jury in the 18th Judicial District for three counts of vehicular homicide. Mr. Jordan retained Mr. Boren and Mr. Samuel "Chuck" Ward to represent him in the criminal case.

In December 2009, Mr. Jordan pleaded not guilty to the criminal charges at his arraignment. Thereafter, the trial was continued on joint motion or on the prosecution's motion on the following dates: March 10, 2010, May 12, 2010, and July 7, 2010. On July 12, 2010, Mr. Boren filed a motion to suppress evidence collected by law enforcement. Though originally assigned to Judge James Best, Respondent assumed the case in July 2010. A hearing on the motion to suppress was held on September 8, 2010, a year after Mr. Jordan was indicted. The minutes of the hearing reflect the District Attorney, represented by Assistant District Attorneys Tony Clayton and Chad Aguillard, presented four witnesses in support of their evidence. The defense did not present any witnesses. Near the conclusion of the hearing, Mr. Clayton informed Respondent that both parties had agreed to leave the hearing open for the defense to present its expert witness. Respondent agreed and continued the hearing until December 1, 2010.

The motion hearing was twice continued until April 6, 2011, nearly eight months after the original motion hearing and nearly twenty months after Mr. Jordan's indictment. On the day of the hearing, Respondent again heard testimony and ultimately denied the motion to suppress for reasons he expressed on the record. Mr. Clayton then stated, "This case has been pending forever. He [Mr. Boren] would like to have a trial date the latter part of September. I don't disagree with him on the face, however, I think the families are entitled to a quicker trial

6

date. I just want to get this case tried."[4] Respondent agreed, stating, "Yeah, it's time to roll." Mr. Boren, however, stated he could not try the case any sooner than September 2011 due to conflicts in two other cases.

In response to Mr. Boren's request to wait until September, Respondent stated that a June trial date was preferable because he was scheduled to rotate off the bench in Pointe Coupee Parish on July 1, 2011, with Judge Best taking his place. A lengthy exchange between Respondent and Mr. Boren then followed, with occasional interjections from Mr. Clayton, regarding Mr. Boren's availability for a June trial. Respondent continued to express concern about delaying the trial until September and having Judge Best take over in his stead, and Respondent also stated his belief that Mr. Boren was not being completely forthcoming about his schedule in June. Therefore, Respondent decided to set the *Jordan* case for trial in June, with September as an alternative date.[5]

Immediately after that hearing of April 6, 2011, members of the victims' families met briefly with the District Attorney and others. Such "meetings" frequently occurred after hearings in the case, as a way for Lisa Jarreau, the coordinator for victims in the District Attorney's Office, to explain the next steps in the process. In addition, the back door leading to the office where the meetings occurred was a way for the families to exit the courtroom. The office has been described as follows: The small room is directly connected to the courtroom by a

---

[4] The record demonstrates the victims' families attended many of the hearings and proceedings in the case, establishing a presence that was surely made known to the court and to Respondent. The minutes show Respondent presided over five hearings, including July 7, 2010, September 8, 2010, December 1, 2010, January 5, 2011, and April 6, 2011. Moreover, in the only two court transcripts made available in the evidence, the victims' families (and their right to speedier proceedings) were referred to by Mr. Clayton three times. The Commission found that, given the high-profile nature of the case and the number of hearings, it is highly likely Respondent knew of the involvement and interest of the families in this case.

[5] In May 2011, on joint motion of defense counsel and the District Attorney's Office, the trial was continued to the September setting. Ultimately, Mr. Jordan entered a guilty plea to a reduced charge and was sentenced by Judge Best.

solid door (the "courtroom door") and is located toward the back of the courtroom. The room contains a coffee pot, a refrigerator, and a desk. As a part of the District Attorney's Office, the room is also accessible through a door (the "internal door") that leads to offices for a secretary for the District Attorney. Between the secretary's office and the room is a small foyer with a staircase leading to the first floor. The staircase, the foyer, the secretary's office, and the room itself are not accessible to the general public. The internal door has a window which is transparent, but contains a mesh-type screen. According to a witness, the window is no bigger than 10-by-10, but "you can see through it pretty clearly." By all accounts, the room is occasionally used, especially on trial days, by court personnel to get a cup of coffee. In sum, the room is small and intimate, requiring parties to be in close contact with each other. As the Hearing Officer found, it would not have been difficult for the parties inside the room to hear conversations among themselves or from other people entering the room.

The following persons attended the briefing/meeting following the April 6, 2011 hearing: members of the victims' families, including Ms. Michelle Forbes, the mother of Sterling Forbes, and Mr. Christopher Austin, the father of Christopher Austin, and members of the District Attorney's Office, including Lisa Jarreau, Tony Clayton, Chad Aguillard, and District Attorney Rick Ward. At some point during the meeting, Respondent entered the room. The purpose of his entry into the room and what he actually said, if anything, is the crux of the case against Respondent as outlined in Count One of the Formal Charge. The Office of Special Counsel ("OSC") alleged that, after entering the room, Respondent told the family members how hard he tried to pick a trial date before he was scheduled to rotate off the case and was critical of defense counsel for not wanting to go to trial with him as the presiding judge because he "puts people in jail." Respondent then said,

8

according to the OSC, "I would have put him in jail for you," referring to Mr. Jordan.

The witnesses gave the following accounts of what transpired at the briefing/meeting:

Respondent testified that, after the hearing, he returned to his office to sign paperwork. At some point, Respondent went to the District Attorney's Office to get coffee. As previously stated, the coffee pot was located in the same room where the families were meeting with the District Attorney and his staff. Respondent testified that he did not recall saying anything when he entered the room. Respondent later clarified that he likely "at least acknowledged these people" as he would not have been so "rude to walk into a room of people and not say anything..." Respondent also stated that he walked into the office through the courtroom utilizing the "courtroom door" as opposed to the "internal door," as that was the most direct way to get to the coffee room.

Mr. Boren was not in the meeting on April 6th. He was notified by Mr. Chuck Ward that courthouse personnel, specifically Judge Best's law clerk, may have "either seen or overhead the conversation between Respondent and the families." Based on this information, Mr. Ward called his uncle, District Attorney Rick Ward, who confirmed Respondent "at some point was present" during the meeting between the family members and the District Attorney and his staff.[6]

District Attorney Rick Ward testified Respondent walked into the meeting through the "interior door" and not the "courtroom door." Mr. Ward recalled seeing Respondent through the window in the interior door. He testified, "My

---

[6] Mr. Boren took contemporaneous notes of his conversation with Mr. Ward, which were entered into evidence as OSC Exhibit 13. According to these notes, Respondent came into the meeting between the District Attorney's Office and the victims and said, "I want to ask one [question] – why do defense lawyers not want to try cases in front of me[?] [Because] they know I'll put people in jail."

initial thought was he was – he sees what – who's in here and so he's not going to come in …." As for what Respondent said while in the room, Mr. Ward testified: "I don't recall anybody saying anything to him. I remember him saying something about wishing that somebody was there with cameras or newspeople or somebody was there so they could record or document the fact that defense lawyers didn't like Respondent because he puts people in jail. And I don't think anybody responded to that, and he left." Mr. Ward believed Respondent was addressing his comments to everybody in the room and that he "seemed a little agitated."[7]

The testimony of Ms. Michelle Forbes and of Mr. Christopher Austin aligned with Mr. Ward's – that is, Respondent entered the room and said something about the pace of the trial. Though stating she could not remember Respondent's exact words, Ms. Forbes testified she remembered Respondent saying the trial would not be heard in June and would likely be heard by a different judge in September. Mr. Austin recalled Respondent was "frustrated" because he "tried to nail down [a trial date] and couldn't do it." In addition, Ms. Forbes also recalled Respondent expressed an opinion about Mr. Jordan's guilt. The Hearing Officer noted that Ms. Forbes did not say Respondent said Mr. Jordan was guilty. Instead, she said, "Well, I cannot remember his exact words, but it was that he *felt* that Mr. Jordan was guilty." (Emphasis added.) Asked later to clarify whether Respondent left her with the "distinct impression" that Mr. Jordan was guilty, Ms. Forbes answered, "Yes." Similarly, Mr. Austin believed Respondent said he would put Mr. Jordan in jail. Mr. Austin later clarified that this was "pretty much" what

---

[7] In his post-hearing brief to the Commission, as he does in his brief to this court, Respondent argues the following, "In the instant matter, the recollection of witnesses concerning Respondent's comments when he entered the District Attorney's coffee lounge on April 6, 2011 either varied and was inconsistent, or could not be recalled. No recording of this incident exists." Nevertheless, Respondent acknowledged that "District Attorney Ward's recitation of what he said seems accurate because Respondent has previously expressed similar sentiments."

Respondent said and that he understood the judge to be "just venting his frustration about not being able to -- having seen all the -- all the motions and then not going to wind up being the trial judge." Both Ms. Forbes and Mr. Austin believed that Respondent was wearing his robe at the time of his comments and that he interrupted their meeting not long after the end of the hearing. Finally, Mr. Austin recalled that Mr. Clayton, after Respondent left, said, "God, I wish, -- I'd rather him not do that."

Mr. Tony Clayton agreed Respondent said something to the people in the room, but did not remember exactly what Respondent said. Furthermore, like Mr. Austin, Mr. Clayton recalls that he said "something to the extent, I wish [Respondent] wouldn't have come in here, and if the defense sees this, they're going to be moving for a continuance or a mistrial.…" Mr. Clayton testified that he looked up and recalled the following: "And I'll say to you that when he -- when I did look at him, I think he knew, you know, we were having our meeting, that -- that he wasn't invited to that meeting. And I think he -- I gleaned from that, and then he got out of there." Mr. Clayton could not remember if Respondent was wearing his robe at the time, could not recall what door Respondent walked through, and finally believed that Respondent "may have" poured himself a cup of coffee. Later in his testimony, Mr. Clayton stated that when looking back at Respondent, he remembered the coffee machine was turned off.

Mr. Chad Aguillard, like Mr. Clayton, could not recall if Respondent was in his robe or from which door Respondent entered the room.[8] Neither could Mr. Aguillard recall exactly what Respondent said other than there was an "exchange."

---

[8] Although the Hearing Officer found that Mr. Aguillard could not recall what door Respondent used to enter the room, we note that Mr. Aguillard's testimony was that Respondent entered the room using the internal door.

11

Nevertheless, Mr. Aguillard was not "excited" about Respondent being in the room. Mr. Aguillard thought Respondent did get a cup of coffee.

At his appearance before the Commission, Respondent acknowledged that, after hearings are held, it is not unusual for the district attorney to meet with either the victim or the family of the victim to explain what occurred during the hearing. Despite knowing this was a common practice, and despite walking into the coffee lounge shortly after the *Jordan* hearing was concluded, Respondent maintained that he did not realize the District Attorney's Office was meeting with the victims' families in the *Jordan* case. Respondent acknowledged, however, that he exercised "poor judgment" when he did not back out of the room after seeing the District Attorney, Assistant District Attorney, and others meeting in the room. As he reiterates in his brief to this court, Respondent apologized for not exiting the room immediately and for the comments he made upon entering the room.

*Conclusions of Fact*

The Commission voted to adopt the proposed conclusions of fact made by the Hearing Officer regarding Count One. The Commission also made some additional conclusions of fact as to Count One following Respondent's appearance before the Commission.

The victims' families were well aware of the delays in the case against Mr. Jordan, which in turn was a source of genuine frustration for at least one family (Mr. Austin's) and more than likely all three families – though Mr. Austin was the only witness who voiced his frustration. Respondent shared this frustration which is best shown by the transcripts from September 8, 2010 and April 6, 2011. The plain language of the transcript indicates Respondent was motivated by two factors. First, Respondent wanted to spare Judge Best from hearing the case mainly because he was not well-versed in the evidentiary issues. Secondly, and more

12

importantly, the transcripts also indicate Respondent was irritated with the pace of the case. This is best displayed by his comments during the hearing on September 8, 2010 – well before his scheduled rotation off the bench. Thus, Respondent shared the frustrations of the families regarding the pace of the trial and was anxious to see it finished. The transcript reveals his frame of mind prior to entering the District Attorney's Office on April 6, 2011.

The Hearing Officer noted that, as is frequently the case with witness testimony, there are some discrepancies in what the witnesses saw and heard when Respondent entered the District Attorney's office. Nevertheless, a majority of the witnesses, including Ms. Forbes, Mr. Austin, and Mr. Ward, heard Respondent say something about defense attorneys and putting people in jail. Mr. Austin and Ms. Forbes interpreted Respondent's remarks to mean Respondent believed Mr. Jordan was guilty. Mr. Ward believed Respondent's comments were more general in nature. On the other hand, Mr. Clayton and Mr. Aguillard testified they could not recall what exactly Respondent said but that he said something. Whatever Respondent did, said, or did not say caused both Mr. Clayton and Mr. Aguillard to wish Respondent had not walked into the room at all.

Considering all the evidence, the credibility of the witnesses, and the facts and circumstances, and the context in which Respondent's comments were uttered, the Hearing Officer found that when Respondent entered the room he spoke about the pace of the case and made an observation about defense attorneys not wanting to try cases in front of him. We agree with that factual finding, and Respondent concedes as much to this court. The Hearing Officer further found that the comment, posed in the form of a rhetorical question, undoubtedly referred to the case currently before Respondent and was calculated to make the District Attorney and the victims feel that Respondent was on their side. We also find the record

13

supports the Hearing Officer's finding. As the Hearing Officer noted, Mr. Austin and Ms. Forbes interpreted those comments in a very specific way – that Respondent was speaking about their case and the Hearing Officer found them reasonable to do so considering the hearing had just concluded shortly before Respondent came into the room.[9]

We thus agree with the Hearing Officer that Respondent knew, at a minimum, that he was discussing the *Jordan* case outside the presence of defense counsel and that the victims' families were in the room. First, Respondent had presided over the *Jordan* case for nearly two years, and the victims' families were referred to at least twice by the District Attorney's Office on April 6, 2011. Second, having just seen Mr. Boren and Mr. Ward, Respondent knew they were not in the room when he made comments about the trial. And finally, as a former Assistant District Attorney, Respondent knew the District Attorney met with families after proceedings and, more specifically, most likely knew that it transpired in the room immediately adjacent to his courtroom. The Hearing Officer found Respondent's testimony that he walked into the room and only exchanged greetings with the room's occupants was both not credible and directly contradicted by three witnesses. The Hearing Officer noted that, either those witnesses, including the District Attorney, lied under oath, or Respondent's testimony with respect to Count One is not credible. The Hearing Officer found the testimony of the District Attorney and other witnesses, including Mr. Austin and Ms. Forbes, to be credible.

---

[9] The Hearing Officer acknowledged Respondent did not make an express statement about Mr. Jordan's guilt. Nevertheless, he noted that Respondent still clearly referred to the defense attorneys in the *Jordan* case as well as his opinion that they were afraid to move forward with Respondent as their judge.

In his brief to the Commission, Respondent disputed the Hearing Officer's "ultimate conclusion of fact that Respondent actually knew the identity of the Jordan case victims' family members prior to entering the District Attorney's Coffee Lounge on April 6, 2011." Respondent argued that the victims' family members were not introduced to Respondent on the record or at any other time and there were 200-300 people in the courtroom when Respondent presided over the motion to suppress hearing in the *Jordan* matter. Respondent makes the same arguments in his brief to this court.

The Commission found the Hearing Officer did *not* conclude Respondent knew the identities of the victims' family members *prior to him* entering the coffee lounge on April 6, 2011. Rather, the Hearing Officer found that "[g]iven the high-profile nature of the case and the number of hearings, it is highly likely that Respondent knew of the *involvement and interest of the families* in the case," (emphasis added), and that, at the time he made the comments at issue, Respondent knew "that the victims' families were in the room." ("The Hearing Officer also finds that Respondent knew, at a minimum, that he was discussing the *Jordan* case outside of the presence [of] defense counsel and that the victims' families were in the room."). The Commission found that, because Respondent may not have known the identities of the family members before entering the room did not mean that, once he entered the room, he did not realize to whom he was speaking.

After reviewing the record, we agree with both the Hearing Officer and the Commission that Respondent knew he was speaking in the presence of the victims' family members at the time he made his comments based on the following: (1) Respondent knew of the involvement and interest of the families in the case; (2) several individuals were in the room meeting with members of the District

15

Attorney's Office shortly after the April 6th hearing in the *Jordan* case;[10] (3) "as a former District Attorney, Respondent knew the District Attorney met with families after proceedings and, more specifically, most likely knew the meeting took place in the room immediately adjacent to his courtroom"; and (4) Respondent's comments "undoubtedly referred to" the *Jordan* case. Although Respondent disputed that he realized the persons meeting with the District Attorney's Office were the victims' families, having observed Respondent's demeanor at his appearance before the Commission and having reviewed the record and the transcript of the proceedings before the Hearing Officer, the Commission found Respondent's testimony in this respect was not credible. We accept the Commission's credibility determination.

Likewise, in his brief to the Commission, Respondent stated that "[c]ontrary to the Hearing Officer's Findings, Respondent did not know that anyone was in the District Attorney's coffee lounge prior to entering, let alone that the District Attorney and his staff were meeting with the Jordan victims' family members in the coffee lounge." The Hearing Officer, however, did *not* find that Respondent knew that anyone was in the coffee lounge prior to entering it. Rather, the Commission noted, the Hearing Officer found only that Respondent knew who was in the room *at the time he made his comments*. The Commission reasoned that, regardless of whether Respondent knew what was happening in the room prior to him entering it, once he entered it, he knew he had walked in on a meeting between the District Attorney's Office and the victims' families and knew to whom he was speaking. Accordingly, the Commission found Respondent's arguments regarding

_____

[10] In addition to attorneys from the District Attorney's Office, the Commission found it significant that Lisa Jarreau, the coordinator for *victims* in the District Attorney's Office, was also present in the room with the victims' families.

which door he used to enter the room and the lack of a "meeting in progress" sign on the door were somewhat beside the point.

*Conclusions of Law*

Respondent is charged with violating Canons 1, 2, and 2A of the Code of Judicial Conduct. Canon 1 provides in part, "A judge should participate in establishing, maintaining, and enforcing, and shall personally observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved." Canon 2 provides, "A judge shall avoid impropriety and the appearance of impropriety in all activities." Canon 2A provides, "A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

Although he contested it before the Hearing Officer, Respondent in post-hearing proceedings before the Commission, as well as in this court, has conceded that his conduct when he entered the District Attorney's coffee lounge violated Canons 1 and 2A, though he does not mention Canon 2. He has acknowledged "in hindsight … that once he entered the District Attorney's coffee lounge and saw that there were people in the room, including the District Attorney and two Assistant District Attorneys, he should not have said anything but should have turned around and immediately exited." Furthermore, although he initially seemed to not recall if he had said anything other than greetings upon entering the room, Respondent now concedes that District Attorney Ward's recollection of what Respondent stated was accurate, in that Respondent stated "something about wishing that somebody was there with a camera or newspeople or somebody was there so they could record or document the fact that defense attorneys didn't like [him] because he puts people in jail." Further, District Attorney Ward confirmed that Mr. Boren's notes accurately reflected his conversation with Chuck Ward

17

concerning what Respondent stated, that being "I want to ask one [question] – why do defense lawyers not want to try cases in front of me cuz they know I'll put people in jail." While the evidence does not support a finding, as set forth in the formal charge, that he specifically stated he would put Mr. Jordan in jail, the record evidence is clear and convincing to this court that Respondent was referring to the defense attorneys in the *Jordan* case and that he knew or should have known that the other persons in the room were family members of the victims. Respondent initially did not concede that his conduct violated the Louisiana Constitution or the Code of Judicial Conduct alleged in Count One; however, he now concedes he engaged in willful misconduct related to his official duty, in violation of La. Const. art. V, § 25(C), "because he exercised poor judgment in not immediately exiting the District Attorney's coffee lounge upon entering and made the statement attributed to him by District Attorney Ward." We thus find that aspect of Count 1 proven by clear and convincing evidence, and thereby subjects Respondent to judicial discipline.

We agree with the Commission that Respondent's actions failed to maintain the integrity and independence of the judiciary and created the appearance of impropriety when he made comments about a pending case to the District Attorney and the victims' families outside of the presence of the defendant and the defendant's counsel. As the Commission found, Respondent's conduct led Ms. Forbes, at least, to believe the trial against Mr. Jordan would end in a mistrial. Furthermore, though neither Mr. Clayton nor Mr. Aguillard recalled if Respondent had said anything, both were concerned enough with Respondent's presence to openly worry about a motion to recuse him. Thus, we conclude the record proves by clear and convincing evidence that Respondent violated Canons 1, 2, and 2A,

18

and that he engaged in willful misconduct related to his official duty in violation of La. Const. art. V, § 25(C).

With regard to Canons 3A(1) and 3A(4), we agree with the Commission that the evidence does not show under the clear and convincing standard that Respondent violated these canons. Canon 3A(4) provides that a judge shall perform his judicial duties without bias or prejudice. As the Commission found, respondent's misconduct did not occur while he was performing a judicial duty, though we agree with the Commission that Respondent's comments were not benign, but were calculated to express Respondent's sympathy to the victim's families for having to endure yet another delay. Furthermore, we agree with the Commission that Respondent was expressing frustration with the defense attorneys in the *Jordan* case, and that his remarks were indicative of bias in favor of the district attorney, at least with respect to scheduling the case. However, as the Commission noted, Respondent had a legitimate concern about rotating off the case because a new judge would have to start from the beginning. Accordingly, we agree with the Commission there was no pattern of bias established.

Canon 3A(1) provides that a judge shall be faithful to the law and maintain professional competence in it, and that a judge shall be unswayed by partisan interests, public clamor, or fear of criticism. Although the Commission recognized that Respondent, by insisting on a June trial date, could have been swayed by "fear of criticism" from the victims' families, Respondent had a legitimate concern about the next judge taking over the case and causing further delays. We thus agree that the record does not support a finding by clear and convincing evidence that Respondent violated Canon 3A(1).

We next turn to Canon 3C, which states: "A judge should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be

19

questioned and shall disqualify himself or herself in a proceeding in which disqualification is required by law or applicable Supreme Court rule." We agree with the Commission that Respondent should have recused himself from the case after knowingly making the comments in the presence of the victims' families. Although Respondent continues to argue that he could not have possibly known the members of the victims' families, we agree with the Commission that Respondent knew the meeting included the victims' families and thus knew to whom he was speaking when he made his comments. As evidenced by the testimony of the victims' family members, who interpreted Respondent's remarks to mean he believed the defendant was guilty, Respondent put himself in a position where his impartiality could be reasonably questioned by the defendant and his counsel. Accordingly, we disagree with Respondent that he had no ethical duty to self-recuse after he made his comments; thus, his conduct did violate Canon 3C. Nevertheless, we are not unmindful that Respondent soon thereafter rotated off the case, such that any potential harm from his conduct was mitigated.

### Count Two and Amended Count Three

Count Two and Amended Count Three originated as a result of a complaint lodged by Michael Owens, a self-represented defendant who appeared before Respondent on a misdemeanor charge. Count Two alleged Respondent held Mr. Owens in direct contempt of court and sentenced him to a term of imprisonment when Mr. Owens' conduct was not contemptuous and without following the proper procedures for the punishment of a direct contempt, including failing to give him an opportunity to be heard orally by way of defense or mitigation. Amended Count Three alleged Respondent held another misdemeanor defendant, Ebonique Minor, in direct contempt of court and sentenced her to a term of imprisonment without following the proper contempt procedures. In both counts, the Commission alleged

20

Respondent abused his contempt authority in violation of Canons 1, 2A, and 3A(1) of the Code of Judicial Conduct and engaged in willful misconduct relating to his official duty, in violation of La. Const. art. V, § 25(C). We agree with the Commission that these charges have been proved by clear and convincing evidence.

*Findings of Fact – Count Two*

The Commission voted to adopt the proposed factual findings made by the Hearing Officer regarding Count Two. The Commission also made some additional findings of fact as to Count Two following Respondent's appearance before the Commission. We conclude these findings are supported by the record, and they are summarized below.

On September 12, 2011, Respondent presided over the bench trial of Michael Owens, a self-represented defendant who was charged with a no-seatbelt violation. Mr. Owens is a resident of Port Allen, Louisiana and is a college graduate. After hearing the State's evidence, Mr. Owens's stipulation that he was not wearing his seatbelt, and the constitutional arguments of the Assistant District Attorney and Mr. Owens,[11] Respondent found Mr. Owens guilty and fined him $25.[12] Mr. Owens than asked whether he could appeal Respondent's decision. Respondent told Mr. Owens he could seek a writ application or "go talk to the Governor about it, ask him why don't he do something about changing the law [sic]." Respondent then added, "Go ask the Governor why he won't change it. He

---

[11] Mr. Owens asserted that the Tenth Amendment of the United States Constitution "doesn't allow the government to make laws concerning our personal safety," and thus the law requiring him to wear a seatbelt is unconstitutional.

[12] Mr. Owens informed Respondent that he would not pay the seatbelt fine. At his judicial misconduct hearing, Respondent testified that when Mr. Owens said this, he felt that was contemptuous conduct, "but I wasn't going to hold him in contempt for it."

21

can veto that seat belt law if he wants to. I can't – I am only one person." Mr. Owens responded, "I thought, you know – it was my idea that the courts are the safeguard of the people's rights, the ones that's supposed to turn back the Government when it oversteps its bounds. And I was hoping that you might see your way clear for that, **but apparently not**." (Emphasis added.)

Mr. Owens testified at Respondent's judicial misconduct hearing and described what he was thinking when he made the comment above: "Well, I thought I was just responding to the Judge's comment about his remark, which I think he was being somewhat facetious there, if you don't like the seatbelt law, go see the Governor and get him to change it." Further, Mr. Owens stated, "Really, in my mind, the point of where you object to a law, which is basically what I said, I thought the courts would be the place to object to a law and the courts would be the ones to turn back the government when it overstepped its bounds. That was what was on my mind."

Immediately after Mr. Owens's comment, the following exchange occurred between Respondent and Mr. Owens:

> Respondent: Now I find you in contempt of court, sir, and **I give you five days in parish jail for that comment.** Good luck to you, sir. I tried my very best to help you out, sir, *but I don't know why you've got to make a comment like that.* That was very disrespectful and contemptuous toward this Court.
>
> Mr. Owens: I didn't hear what you said, Your Honor.
>
> Respondent: I said that was very disrespectful and contemptuous toward this Court *to make a comment like that*, that I thought you would do the right thing, but obviously this court doesn't do that.
>
> Mr. Owens: I mean that's what I thought was –
>
> Respondent: *That is contemptuous conduct right there to say something like that, sir.*
>
> Mr. Owens: Well, that wasn't meant that way, but you can take it any way you like.

(Deputies take the defendant into custody)
Proceedings terminated as to this case. (Emphasis added.)

Mr. Owens admitted his last comment that Respondent "can take it any way [he] like[s]" was probably "a little contemptuous at that point," but he explained, "Well at that point when I said that, they were already taking me out the side exit behind the jury box. … So I guess I was little upset. And I think I was thinking, well, if I'm going to get sent to jail for contempt, I might as well say what's on my mind…." After being held in contempt by Respondent, Mr. Owens was immediately arrested and sent to the West Baton Rouge Parish jail. He served three and a half days in jail and was kept in the general holding cell for the first two days.

Respondent testified he held Mr. Owens in contempt of court for his "insolent behavior," which Respondent defined as "disrespectful, just impugning the Court's dignity, disruptive of the court, just a number of things." Respondent stated that he did not hold Mr. Owens in contempt for what he said but rather for how he said it. In explaining his comment to Mr. Owens that such was contemptuous conduct "to say something like that," Respondent explained that "like that" referred not to Mr. Owens's actual comment, but rather to his "physical demeanor." Respondent described Mr. Owens's physical demeanor as follows:

> He -- he had his arms crossed and he was -- he wears glasses. And he was kind of looking over his glasses. And he was snarlin' and he was apparently -- apparently -- well you wouldn't -- it was just -- it was like I explained later in the thing, it was almost like saying you dumb a-double-s. Either you won't follow my -- you wouldn't follow the law because you're stupid to realize it or you just won't follow the law because you're too crooked to do it. That's the way I took it. That was the way he meant it.

23

Respondent further explained that he believed Mr. Owens was "mean muggin'," which he described as "where they look at you like that (indicated) and you just know they're mad at you."

Respondent admitted he did not use the words "defense or mitigation" but that he did "give [Mr. Owens] an opportunity" to defend himself. Respondent testified he usually starts a "conversation" with someone who he believes was in contempt thereby giving that person an opportunity to explain. Respondent further testified he gave Mr. Owens an opportunity to explain himself when he allowed him to continue speaking after he sentenced him to contempt. When Mr. Owens said "you can take it any way you like," Respondent believed this statement simply "re-affirmed that the contempt was correct."

The Hearing Officer heard other witnesses. Ms. Ashley Woods is an Assistant District Attorney for the 18th JDC and was in Respondent's court when Mr. Owens was held in contempt of court. She recalled Mr. Owens had strong feelings about the constitutionality of the seatbelt law, was "a little angry maybe," and "crossed his arms." However, she did not feel like he was out of line, noting that he was an older gentleman who was upset but not disrespectful.

Mr. Ken Fabre is an Assistant District Attorney in the 18th JDC and handled the seatbelt violation on behalf of his office. He was also present when Mr. Owens was held in contempt. Mr. Fabre testified that from the beginning Mr. Owens "was very, very, you know, confrontational, not in an overt way, but a -- kind of like in a cerebral way...." Mr. Fabre was not looking up when Mr. Owens made his statement, but acknowledged that Mr. Owens had previously assumed a confrontational body posture, that he was making a statement the government was overreaching and he had no confidence in the system, and that Mr. Owens's comment ("I was hoping you could see your way clear") was "salty."

24

Two other witnesses who testified at the judicial misconduct hearing also were in court when Mr. Owens was held in contempt: Ms. Kelli Hebert, a Deputy Clerk of Court, testified she did not remember anything about Mr. Owens's facial expression but his attitude was "bad from the start." When asked to describe Mr. Owens's attitude, Ms. Hebert cited his refusal to pay the $25 fine and his starting off the trial with a "chip on his shoulder." Ms. Bridgette Berndt, a secretary in the Public Defender's Office for the 18th JDC, saw Mr. Owens make his final statement before being sentenced, and described him as "very arrogant, just kind of kept making faces at the Judge.... Just real arrogant, like he had a chip on his shoulder." Ms. Berndt said Mr. Owens sneered, rolled his eyes, and then said something ugly (though she did not hear what he said exactly). She added that, if there were a camera recording of the hearing, "we wouldn't be here today [referring to the hearing]."

Prior to hearing the Michael Owens case, Respondent held Ms. Ebonique Minor in contempt of court for reasons that are discussed in connection with Amended Count Three of the Formal Charge. After holding Ms. Minor in contempt of court, Respondent stated, "People mistake my good nature today for weakness. I fell [sic] sorry for everybody from here on now."[13] Respondent admitted that his statement would include Mr. Owens, whose case was heard after Ms. Minor was held in contempt of court.

During his appearance before the Commission, Respondent conceded he did not ask Mr. Owens clarifying questions regarding his intentions or his statements, and that he "fell short" by not doing so and putting that on the record. Respondent also confirmed he has made changes to how he holds people in contempt of court.

---

[13] This is Respondent's statement as it appears in the official court transcript. However, Respondent testified that what he actually said was, "I feel sorry for everybody from the M's on now," referring to the alphabetical order in which he disposes of his docket.

He testified that, if he has ordered jail time, he will suspend the sentence for ninety days to give the person "an opportunity to take it up on appeal if they to [] see if I'm incorrect or if that's too much or if I was wrong about contempt." He further testified:

> [S]ince all that has come up, I've – I've pulled back a lot on that. It's – the contempt – the contempt will be only the worst of the worst. I'[ve] just – I'[ve] just made up my mind that I'll just have to have thicker skin and just maybe accept some things and use more cautions.

*Conclusions of Fact – Count Two*

The Commission voted to adopt the proposed conclusions of fact made by the Hearing Officer regarding Count Two. We also adopt those conclusions of fact. The transcript from September 12, 2011, reveals that Respondent and Mr. Owens, a self-represented litigant, engaged in a moderate amount of back and forth regarding the constitutionality of the seatbelt statute, including whether such a statute is prohibited by the Tenth Amendment. The exchange is about eleven pages long in the transcript. The exchange ends rather abruptly after Mr. Owens says, "And I was hoping that you might see your way clear for that, but apparently not." Respondent then held Mr. Owens in contempt. The contemporaneous record contains no indication as to Mr. Owens's physical demeanor, which Respondent later claimed as justification for the finding of contempt.

*Findings of Fact – Amended Count Three*

The Commission voted to adopt the proposed factual findings made by the Hearing Officer regarding Amended Count Three. Our review of the record supports these findings, and they are summarized below.

On September 12, 2011, Respondent presided over the bench trial of Ebonique Minor, a self-represented litigant, who was charged with disturbing the peace. After finding Ms. Minor guilty, Respondent explained his sentence to Ms.

26

Minor, to which she simply responded, "Okay." Respondent then called the next case. The transcript reflects the following:

> The Defendant (Ms. Minor): (With her back turn [sic] to the Court Reporter, the Defendant says something that the Court Reporter cannot understand.)
>
> The Court: Come on back. There you go. You couldn't help yourself. **Fifteen days in the parish jail for contempt of court.**
>
> [Assistant District Attorney]: You just set yourself up.
> The Court: I can't believe you did that. Then you will be on probation after that. People must mistake my good nature today for weakness I guess. I fell [sic] sorry for everybody from here on now. Naomi Montgomery [the name of the next defendant].
> (Emphasis added).

At some point later while Respondent was still holding court, Ms. Minor was brought back in front of Respondent. Both briefly discussed Respondent's finding of contempt of court:

> The Defendant (Ms. Minor): I didn't know that after -- I mean if you're talking about you talk to the judge, I didn't know that was contempt of court.
>
> The Court: It's not just talking.
>
> [Assistant District Attorney]: It's the attitude.
>
> The Court: It's what you say and the way you say it with the attitude you say it with, that's what got you in trouble, okay. That is contemptuous conduct. You know, it's one thing if you just turn around and walk away and I'm sorry that's the way it went -- … but that attitude--just like this gentleman right here (indicating Mr. Owens), that attitude was just like you dumb a-double-s, and that's contemptuous and I'm sorry.
>
> The Defendant (Ms. Minor): What I said -- I mean I thought it wasn't right, but I wasn't intending on –
>
> The Court: It's just the way you said it. All right. Mary Ruiz --

Ms. Minor did not testify at Respondent's judicial misconduct hearing. Respondent testified that Ms. Minor started to walk away from the podium and, when she started speaking, he looked up and caught her saying the word "shit"

27

while still in the courtroom (presumably at a level audible to other people). He testified, "But I caught the word 'shit.' And what I thought she said was, this is some stupid shit."

Respondent admitted he never told Ms. Minor she used profanity but he "told her what she said and the attitude she said it with…." He admitted he did not immediately allow Ms. Minor the opportunity to defend or mitigate her conduct in accordance with La. Code Crim. Proc. art. 22 prior to sentencing her to fifteen days in jail. Nevertheless, he testified he did allow her to address the court prior to her being sent to jail and explained the reason why she was held in contempt:

> I just -- I just didn't. I was -- I was going to let her sit there and we were going to talk about it after -- I let -- I have to ask -- I do that on a lot of my -- well, used to, not anymore. On my contempts, if I hold them in contempt, I have them sit on the side and then we'll go back and talk. And I'll talk to them about everything that's happened. And then we'll decide what -- what to do from there. Most people -- if anybody says, Judge, I'm sorry, I shouldn't have said that, I will let them go, get out of here, just be careful, don't do that again. That's with anybody if they -- if they do that. If they don't apologize, then I let -- I let them go ahead and serve their time. But I'll go back and talk to everybody just about, everyone.

*Conclusions of Law – Count Two and Amended Count Three*

The Formal Charge accused Respondent of committing judicial misconduct when he held Mr. Owens in contempt "without just cause" and for failing to "comport with the procedures required by law for the punishment of contempt, and therefore amounted to an abuse of [his] contempt power." With respect to Ms. Minor, the Formal Charge accused him of failing to "comport with the procedures required by law for the punishment of contempt."

The Louisiana Code of Civil Procedure defines contempt of court:

*La. C. Cr. P. Art. 20*: A contempt of court is an act or omission tending to obstruct or interfere with the orderly administration of justice, or to impair the dignity of the court or respect for its authority. Contempts of court are of two kinds, direct and constructive.

28

*La. C. Cr. P. Art. 21*: A direct contempt of court is one committed in the immediate view and presence of the court and of which it has personal knowledge; …. A direct contempt includes, but is not limited to, any of the following acts:

\* \* \*

(5) Contumacious, insolent, or disorderly behavior toward the judge or an attorney or other officer of the court, tending to interrupt or interfere with the business of the court or to impair its dignity or respect for its authority;
(6) Breach of the peace, boisterous conduct, or violent disturbance tending to interrupt or interfere with the business of the court or to impair its dignity or respect for its authority;

(7) Use of insulting, abusive, or discourteous language by an attorney or other person in open court, or in a motion, plea, brief, or other document, filed with the court, in irrelevant criticism of another attorney or of a judge or officer of the court ….

We first turn to whether Mr. Owens's behavior warranted the sanction of criminal contempt under La. Code Crim. Proc. arts. 21(5), (6), or (7). In his brief to this court, Respondent argues that Mr. Owens did in fact engage in contemptuous conduct that was in contempt of court. As the Commission noted, Respondent's defense rests for the most part on his contention that Mr. Owens was contemptuous because of his facial expressions and overall demeanor. We find no support for such a defense on this record. [14]

According to Respondent, Mr. Owens was "snarlin'" and, through his physical demeanor, was telling Respondent that he was too "stupid" or too "crooked" to find the seatbelt law unconstitutional. Respondent said he at least

---

[14] As the Commission noted, there are no Louisiana cases upholding a judge's finding of direct contempt based on the offender's demeanor. The Commission reasoned that contemptuous behavior should be "apparently rebellious, belligerent or in open defiance of the authority of the Court." *State v. Taylor*, 451 So. 2d 691, 692 (2nd Cir. 1984). The Commission reasoned that, even assuming Mr. Owens was "mean muggin'" as described by Respondent or if he was sneering as described by Ms. Berndt, it would be difficult to conclude this was contemptuous behavior as found under La. Code Crim. P. art. 21 and does not appear to be "*apparently rebellious*, belligerent, or in *open* defiance of the authority of the Court." (Emphasis added.) We need not address that issue, because we find that by his own explanation for imposing contempt in the transcript of the exchange with Mr. Owens, Respondent was focused on Mr. Owens's comment rather than his physical demeanor.

attempted to explain to Mr. Owens that his demeanor was contemptuous when he said it was contemptuous to "say something like that." In this court, Respondent argues that an individual before the court may be held in contempt solely for his facial expressions and physical demeanor. Although the Commission noted the absence of a video,[15] we find insufficient evidence in the record to support a finding that Mr. Owens's demeanor was contemptuous within the meaning of La. Code Crim. Proc. art. 21. As the Commission found, of all the witnesses (other than Respondent), only Ms. Berndt recalled that Mr. Owens sneered and rolled his eyes around the time Respondent found Mr. Owens in contempt. Notably, the transcript reveals that Respondent never once indicated to Mr. Owens that his facial expressions or physical demeanor was directly contemptuous to the court; instead, Respondent singled out only Mr. Owens's comment "but apparently not." Respondent stated to Mr. Owens: "but I don't know why you've got to make a comment like that;" "that was very disrespectful and contemptuous toward this Court to make a comment like that, that I thought you would do the right thing, but obviously this court doesn't do that;" and "[t]hat is contemptuous conduct right there to say something like that, sir." Furthermore, the audiotape indicates Mr. Owens's comment and his alleged demeanor were not disruptive to the court, because he and Respondent were just wrapping up a lengthy exchange about the seatbelt law.

Notably, Respondent did not attempt to argue to the Commission, nor does he do so here, that Mr. Owens's statement, by itself, was contemptuous. Respondent argued that Mr. Owens's demeanor as well as his "parting words" were contemptuous because they were intended as a "direct insult to the intelligence of Respondent." In support of this, Respondent's brief cited Mr. Fabre

---

[15] Under Canon 3A(9), the situations in which trial courts may authorize video recordings are limited; consequently, video recordings are not routinely made of litigants.

who stated that he interpreted Mr. Owens's statement to mean that Respondent "apparently couldn't understand something that was simple." But as the Commission found, Mr. Owens's parting words ("but you can take it any way you like") only came after Respondent had found Mr. Owens in contempt.

We agree with the Commission that, instead of showing a contemptuous or insulting litigant, the transcript, audio recording, and witness testimony show that Mr. Owens, a self-represented litigant, and Respondent engaged in a lengthy exchange over the constitutionality of the seatbelt statute. After the exchange, Mr. Owens made a single comment that was less than respectful, but not contemptuous. In this way, as the Commission reasoned, this case is similar to *In re: Masinter*, 355 So. 2d 1288 (La. 1978). In the *Masinter* case, the Supreme Court overturned the finding of contempt of court of an attorney who (indirectly) accused the court of trying to suppress the truth. The judge had sustained a number of objections against the attorney which prompted the attorney to remark that "nobody seems to want to get to the truth here...." *Id.* at 1290. When asked by the judge whether he was accusing the court of "trying to suppress the truth," the attorney replied, "I may just have to do that later." *Id.* The court held that, "[a]lthough improper and unwise, the lawyer's response was not contemptuous, principally because it was a response to a question by the judge which seemed to invite and encourage further verbal sparring." *Id.* at 1291. Here, Respondent declined to find merit to Mr. Owens's constitutional claim and directed him to go to the governor if he had a problem with the constitutionality of the seatbelt law. Mr. Owens's retort may have been unwise, but we do not find it to be contemptuous. Furthermore, it certainly did not merit a sentence of five days in jail. We thus conclude, as did the Hearing Officer and the Commission, that by a clear and convincing standard, Respondent committed legal error when he found Mr. Owens in contempt of court.

We next turn to whether Respondent complied with the procedural requirements outlined in La Code Crim. Proc. art. 22 before holding Mr. Owens and Ms. Minor in contempt.[16] Respondent argues that he substantially followed the procedural requirements in both the Minor and Owens cases. He testified that his usual contempt procedure is to "hold them in contempt" and "have them sit on the side and then we'll go back and talk." If the person apologizes, he will let them go with a warning. If the person does not apologize, "I let them go ahead and serve their time." Respondent, however, concedes that this method of handling contempt of court cases was "not perfect," but contends he substantially followed the requirements of La. Code Crim. Proc. art. 22 and, furthermore, has promised to adhere more closely to the statute in future.

We agree with the Hearing Officer and the Commission that Respondent's method of handling contempt procedures fails to comply with the procedures outlined in La. Code Crim. Proc. art. 22. Under Article 22, a judge may find a person guilty of direct contempt only "after affording him an opportunity to be heard orally by way of defense or mitigation." Respondent's process of holding persons in contempt and then giving them an opportunity to apologize is not in compliance with Article 22 and is clearly legal error. Furthermore, it seems evident Respondent did not advise any of the persons he found in contempt that he would let them go if they simply apologized. In Ms. Minor's case, Respondent found Ms. Minor in contempt and then brought her back later so she could defend herself in accordance with Respondent's self-described but erroneous procedures. Although

---

[16] La. Code Crim. P. art. 22, entitled "Procedure for punishing direct contempt," provides:

> A person who has committed a direct contempt of court may be found guilty and punished therefor by the court without any trial, after affording him an opportunity to be heard orally by way of defense or mitigation. The court shall render an order reciting the facts constituting the contempt, adjudging the person guilty thereof, and specifying the punishment imposed.

she acknowledged her language, and seemed to indicate she did not realize she was speaking to the court when she turned away, Respondent did not inform her that a simple apology would result in dismissal. Instead, she received a fifteen-day sentence, seven of which she actually served. In Mr. Owens's case, Respondent found Mr. Owens in contempt of court to which Mr. Owens only briefly responded, "Well, that wasn't meant that way, but you can take it any way you like." In Mr. Owens's case, we agree with the Hearing Officer that Respondent failed to follow his own procedure, much less comply with the requirements of La. Code Crim. Proc. art. 22, when he failed to allow Mr. Owens an opportunity to defend or mitigate his behavior after he was found in contempt. In both cases, we agree with the Commission that Respondent did not comport with the strict procedures provided for in Article 22 and, thus, he committed legal error.

Additionally, in the case of Mr. Owens, Respondent failed to adequately "render an order reciting the facts constituting the contempt" in accordance with La. Code Crim. Proc. art. 22. Such an order outlining Mr. Owens's conduct was especially important in this case, as the Commission reasoned, because it was not apparent from the record that Mr. Owens committed any act which could be regarded as contemptuous. In promising to do a better job in the future, Respondent conceded in his testimony that "body language can't be picked up on the record, facial expression can't be picked up by the record…." In his post-hearing brief, as he does in this court, Respondent argues that he killed two birds with one stone by addressing Mr. Owens's conduct when he was addressing Ms. Minor. [17] Like the Hearing Officer, we find this argument unpersuasive.

---

[17] "It's what you say and the way you say it with the attitude you say it with, that's what got you in trouble, okay. That is contemptuous conduct. You know, it's one thing if you just turn around and walk away and I'm sorry that's the way it went -- … **but that attitude -- just like this gentleman right here (indicating Mr. Owens),** that attitude was just like you dumb a-double-s, and that's contemptuous and I'm sorry." (Emphasis added.)

33

Respondent's explanation about Mr. Owens's conduct to a subsequent defendant is not an adequate recitation of the facts constituting the contempt. In fact, other than a fleeting reference to "attitude," the contemporaneous record does not reveal Mr. Owens's conduct, as Respondent essentially recognizes in his brief. Furthermore, Respondent admitted his reasons for holding Mr. Owens in contempt were not related to what he actually said, but rather to how he said it, meaning his physical demeanor. Such a rationale for contempt was completely different from the reasons Respondent held Ms. Minor in contempt. As the Commission reasoned, even if a judge could combine the reasons for contempt for two separate defendants, Respondent's attempt at an explanation was woefully inadequate in this case.

By failing to properly follow the strict procedures of La. Code Crim. Proc. art. 22, we agree with the Commission that Respondent committed legal error in the Owens and Minor cases. In addition, Respondent committed legal error when he held Mr. Owens in contempt of court even though Mr. Owens was not disruptive and did not impair the dignity of the court as prohibited under La. Code Crim. Proc. art. 21.

The standard to apply to determine whether legal error can constitute ethical misconduct is stated in *In re: Quirk*, 97-1143 (La. 12/12/97), 705 So. 2d 172. This court recognized that a judge may be found to have violated La. Const. art. V, § 25(C) "by a legal ruling or action made contrary to clear and determined law about which there is no confusion or question as to its interpretation and where this legal error was egregious, made in bad faith, or made as part of a pattern or practice of legal error." *Quirk*, pp. 11-12, 705 So.2d at 18-81. The court further stated in *Quirk*:

> A single instance of serious, egregious legal error, particularly one involving the denial to individuals of their basic or fundamental rights, may amount to judicial misconduct. An example of this is

34

where a judge told the jurors sitting on a criminal case to "go in that room and find the defendant guilty," thereby depriving the defendant of his fundamental right to be tried by a jury. Intentionally refusing to follow the law constitutes a legal error made in bad faith and may also be grounds for a finding of judicial misconduct. Finally, a pattern of repeated legal error (although not necessarily the same error) over a period of time can constitute judicial misconduct, regardless of whether the errors were made in bad faith or were egregious in nature.

Although several state supreme courts have imposed discipline for legal errors made by judges which were egregious, made in bad faith, and/or were part of a pattern and practice of legal error, there was no dispute in those cases the legal rulings made by those judges were clearly error under statutes or jurisprudence. For example, it has been held to be not only judicial error but also judicial misconduct when judges have consistently failed to advise defendants of their constitutional right to counsel, denied defendants a full and fair hearing, coerced guilty pleas, directed the jury to find a defendant guilty, failed to order recognizance or bail in nonfelony cases, or sentenced defendants to jail when only a fine is provided for by law.

*Quirk*, p. 8, 705 So.2d at 178 (citations and footnote omitted).

We have explained that "[t]he contempt power wielded by judges is an awesome responsibility and, when exercising such power, judges must diligently and in good faith comply with the strictures of the law governing its execution. The failure to do so ... constitutes an abuse of the contempt power." *In re: Jefferson*, 99-1313 p. 5 (La. 1/19/00), 753 So.2d 181, 185.

In his post-hearing brief and his brief to this court, Respondent argues his actions, while sometimes imperfect, did not reach the level of judicial misconduct as alleged by the OSC. More specifically, Respondent argues this Court has imposed discipline for abuse of a judge's contempt authority when (1) the person who was the subject of the contempt order did not engage in conduct constituting contempt of court; (2) proper contempt procedures were not substantially complied with; and (3) excessive contempt sentences were often imposed. The Commission agreed with Respondent's recitation of the law, but reasoned that the *Quirk*

standard is not so inflexible as to prevent the Commission and ultimately the court from finding that a pattern or practice of legal error was established here.[18]

We agree with the Commission the record demonstrates a pattern or practice of legal error by Respondent. First, Respondent's conduct with respect to his violations of the law for contempt all took place on the same day and was only discovered because Mr. Owens filed a complaint about what happened to him. Second, with respect to Ms. Minor, Respondent admitted his contempt of court procedures with respect to allowing the offender to present evidence in defense or mitigation differed from what is required by the Code of Criminal Procedure. Third, Mr. Owens was not even afforded the same opportunity as Ms. Minor, but was instead only allowed to say a brief comment after he was held in contempt. As the Commission found, Respondent effectively deprived Mr. Owens of his fundamental right to be heard. Further with respect to Mr. Owens, there was no adequate explanation of what constituted the contempt. Mr. Owens could hardly have responded in defense or mitigation to allegations of which he had no notice. In the end, Respondent held Mr. Owens in contempt and sent him to jail without showing that Mr. Owens's conduct tended to disrupt, impair the dignity of or otherwise challenge the authority of the court.

---

[18] The Commission cited three cases from this court wherein judges were found to have committed legal error in the handling of contempt cases before them. In *In re Judge Sassone*, 07-0651 (La. 6/29/07), 959 So. 2d 859, this court found the respondent abused her contempt power by not giving defendants an opportunity to be heard before holding them in contempt and by failing to follow legal procedures required for holding defendants in contempt. Her failure to follow legal procedures as well as her excessive sentences for contempt constituted a "pattern or practice" of legal error under the *Quirk* standard.

In *In re Jefferson*, 99-1313 (La. 1/19/00), 753 So. 2d 181, this court removed the respondent judge for, among other things, abusing his contempt power by finding a prosecutor in contempt contrary to clear and determined law and by repeatedly ignoring the procedures required for contempt of court.

In *In re Sims*, 14-2515 (La. 3/17/15), 159 So. 3d 1040, this court suspended the respondent judge in part for committing a bad faith legal error by failing to follow the procedures required for contempt of court. This court found the respondent ignored the proper procedures required of contempt of court due to her personal frustration with an assistant city attorney.

We agree with the Commission these incidents taken together create a pattern or practice of legal error that rises to a level of judicial misconduct under *Quirk*. For instance, Respondent had been a judge for fourteen years when he held Mr. Owens and Ms. Minor in contempt. Furthermore, there is clear and convincing evidence that with respect to Mr. Owens, Respondent's decision to hold him in contempt was motivated by bad faith (as evidenced by his statement that he felt sorry for all defendants who came after Ms. Minor, which would have included Mr. Owens).

The Commission concluded Respondent's failure to follow the requirements of La. Code Crim. P. art. 22 with respect to Mr. Owens constituted an egregious legal error under the *Quirk* standard. The Commission rejected, as do we, Respondent's argument that he at least gave Mr. Owens an opportunity to speak after he held him in contempt and thus substantially complied with Article 22. After Respondent found Mr. Owens in contempt, Mr. Owens tried to speak, but was immediately cut off by Respondent, and then Mr. Owens issued his parting words ("but you can take it any way you like") as he was being escorted from the courtroom by the deputies. As did the Commission, we do not consider Respondent's action as providing Mr. Owens any opportunity to speak by way of defense or mitigation. Respondent's failure to provide Mr. Owens with a right to be heard to be especially grievous given that Respondent sought to deprive Mr. Owens of his liberty by sentencing him to a term of imprisonment as a punishment for his supposed contemptuous conduct.

We thus agree that, with respect to both Count Two and Amended Count Three, Respondent failed to personally observe a high standard of conduct so as to preserve the integrity and independence of the judiciary in violation of Canon 1; failed to respect and comply with the law and to act in a manner that promotes

37

public confidence in the integrity and impartiality of the judiciary, in violation of Canon 2A; and failed to be faithful to the law and maintain professional competence in it, in violation of Canon 3A(1). We further find that Respondent engaged in willful misconduct related to his official duty in violation of La Const. art. V, § 25(C).

**Amended Count Four**

Amended Count Four alleged Respondent made inappropriate comments and exhibited a lack of proper decorum, demeanor, and temperament in seven criminal cases over which he presided in July and September 2011 and November 2012. The Commission alleged Respondent's conduct violated Canons 1, 2A, 3A(2) (a judge shall maintain order and decorum in judicial proceedings), and 3A(3) (a judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity) of the Code of Judicial Conduct. The Commission further alleged Respondent engaged in willful misconduct relating to his official duty and engaged in persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, in violation of La. Const. art. V, § 25(C). In his brief to this court, Respondent concedes the charges in Amended Count Four were proved by clear and convincing evidence and that he is subject to discipline therefor. Accordingly, the facts supporting this charge are not in serious dispute.

*Findings of Fact*

Christopher M. Williams: While presiding over Mr. Williams's criminal case, Respondent made an inappropriate comment and displayed a joking, jovial attitude toward women who had been abused by men. After being told that Mr. Williams was charged with domestic abuse by strangulation, Respondent and Assistant District Attorney Ken Fabre took part in the following exchange:

38

The Court: That's what it was?  All right.  Domestic abuse battery by strangulation.  **Is she alive?  Yes indeed.  Now the victims know exactly what to say.**

[Assistant District Attorney]: Exactly.

The Court: **It's amazing.**  But, anyway, I digress....

(Emphasis added.)

In his post-hearing brief, Respondent states that he was "simply asking a question in order to better understand the law and to determine whether the charge was a felony and was also pointing out an anomaly, or internal inconsistencies, in the law of domestic battery..." In his judicial misconduct hearing, Respondent testified that he was genuinely confused about the meaning of strangulation in the context of domestic abuse.

Travis Braxton: While presiding over Mr. Braxton's criminal case, Respondent made inappropriate comments and displayed a joking, jovial attitude toward women who had been abused by men.  During the arraignment of Mr. Braxton, who had been charged with domestic abuse battery, he pleaded not guilty and Respondent set a trial date.  Immediately thereafter, Respondent participated in the following exchange with Assistant District Attorney Fabre:

The Court: So, if you choke them, that's a felony.  If you punch them in the eye, that's a misdemeanor.

[Assistant District Attorney]: What about if they break their arm?

The Court: **If you punch them in the eye and then choke them, they'll never know you choked them.**

[Assistant District Attorney]: Right, right.

The Court: That's some crazy stuff, man.  It's like they want to legislate for every little thing. ... Everything little thing.  Oh, you touched the right finger?  That's a different thing there now.  Oh you grabbed her by the left arm, that's a different crime. Crazy. And, I say that, but women beat upon the men too.  I see that a lot now days.

(Emphasis added).

39

Respondent testified he pushed away the microphone, but the conversation was still audible to the court reporter. He further testified that the conversation between him and Mr. Fabre was only heard by people in front of the courtroom, including District Attorney and public defender's staffers. Respondent stated that his comments were not intended to mock domestic abuse victims, but to debate the practical implications of certain statutes.

McKinley Thompson: While presiding over Mr. Thompson's criminal case, Respondent made inappropriate comments and displayed a joking, jovial attitude toward women who had been abused by men. Mr. Thompson was charged with domestic abuse battery and was in front of Respondent for his arraignment. Mrs. Tammy Thompson, presumably Mr. Thompson's wife, was present in court and indicated she wanted to drop the charges. Respondent states he began asking Mrs. Thompson a series of questions to ensure that she "was not being coerced to dismiss the charge and she would be safe if she returned home with Mr. Thompson." Respondent's questions were prompted by a request by the District Attorney to question all victims seeking to drop domestic abuse charges. The following exchange took place between Respondent and Mrs. Thompson:

The Court: Now, Ms. Thompson, what happened? **He hit you?**

Ms. Thompson: Yes.

The Court: Or did he **choke** you?

Ms. Thompson: He hit me.

The Court: And, he choked you?

Ms. Thompson: No.

The Court: And, he beat you?

Ms. Thompson: No.

The Court:  He just hit you.

Ms. Thompson: He hit me.

The Court: He just hit you.

Ms. Thompson: He hit me.

The Court: He didn't beat you, though.  What's the difference?  It's more than one hit that takes a beat - to be a beating?

Ms. Thompson: No. A beating is when you really get beat and get hurt.

The Court: And what did he do to you?

Ms. Thompson: He just hit me.

The Court: Where did he hit you at?

Ms. Thompson: In my eye.

The Court: He popped you in your eye?

(Emphasis added).

During his judicial misconduct hearing, Respondent was asked why he kept asking Mrs. Thompson whether she was choked. Respondent responded, "I was trying to see what the severity of what took place, how bad was this. That's what I'm trying to figure out." Regarding his exchange about whether Mr. Thompson "hit" or "beat" Mrs. Thompson, Respondent testified he was attempting to understand the testimony because the victim was seemingly trying to minimize the incident.  After engaging with Mrs. Thompson, Respondent began asking both Mr. and Mrs. Thompson a series of questions related to the domestic abuse charge including whether or not the "hit" was intentional or just an accident. Mr. Thompson said it was an accident, while Mrs. Thompson insisted that it was, in fact, intentional.  Respondent continued with his exchange with Mr. Thompson and finally asked Mrs. Thompson, "How are you all getting along now?" [referring to her relationship with Mr. Thompson].  After Mrs. Thompson responds, "Great,"

41

Respondent says to Mr. Thompson, "You better give that woman a hug and thank her for dropping the charges on you. You'd better go ahead. You'd better hug her and thank her for dropping them charges... (Mr. Thompson hugs Mrs. Thompson)... Ain't that better than fighting?" After Respondent's comments, the courtroom erupted in applause.

Lisa Williams: While presiding over Ms. Williams' criminal case, Respondent made insensitive, discourteous, and injudicious comments, leading to outbursts of laughter. Ms. Williams was charged with, among other offenses, theft of goods from a Wal-Mart store. After Respondent was informed that Ms. Williams had confessed to taking Aveeno lotion, he asked her: "What's wrong, you was ... What, your skin was ashy? [Laughter] You were ashy trying to get your skin right with some Aveeno?" The comments caused audible laughter in the courtroom. Respondent continued: "Come on ... What was it? ... What did you need that lotion for?"[19]

During his judicial misconduct hearing, Respondent testified he was asking Ms. Williams (prior to her sentencing) about the lotion to determine whether she actually needed it, because it would have made an impact on sentencing. Respondent admitted to participating in a "friendly" conversation with Ms. Williams about where she could continue shopping (because she was no longer welcome at certain Baton Rouge area Walmarts). Though "friendly," Respondent denied at the hearing the conversation could be characterized as inappropriate "joking."

---

[19] The OSC contends that Respondent used a particular vernacular when he said "for" and thus the transcript to be accurate should read: "What did you need that lotion fa'?" Respondent counters that the certified transcript contains the correct spelling of the word "for" and thus that is the accurate quotation.

<u>Katie Johnson and Teresa Fields:</u>  While presiding over the criminal cases of Ms. Johnson and Ms. Fields, Respondent made insensitive, discourteous, and injudicious comments, leading to outbursts of laughter. Ms. Johnson and Ms. Fields were charged with theft of goods from a Wal-Mart store.  Respondent, while taking a plea of guilty from Ms. Johnson and Ms. Fields, asked them: "What y'all stole? ... Baby clothes."  He then said:

> Now see how I knew that, you are a pretty good sized girl.  You are like me, you are pretty good sized. I figured out the baby clothes. That seems to be like a common thing, people just go to Wal-Mart and steal baby clothes. Man, go to Baby Gap or something if you are going to take a chance, get on the big ones.  Go for something worth something, man.

These comments provoked courtroom laughter.[20]

With respect to stealing clothes from the Baby Gap instead of Walmart, Respondent testified he was simply being "facetious" with the defendants. Respondent later said "facetious" was not an accurate description and asserted he was not suggesting to the defendants that they steal at all. Shortly thereafter, he stated, "I was talking about the -- in other words, if you're going to take a chance and get a caught stealing, why not try for the bigger things?  Why -- why this Wal-Mart?  Why did you pick this one.  That's what I -- that's the point I was trying to make.  But I didn't do a good job of doing it, and I have to take -- and I do take responsibility for it."

With respect to his comments about the size of one of the defendants, Respondent said she appeared to be a "motherly type." When asked what her size had to do with the charges, Respondent said theft of baby clothes is a big problem but otherwise he did not know why he said the comments other than "it just looked like she'd be a mama to me…."

---

[20] This incident took place on the same day that Mr. Owens (Count Two of the Formal Charge) was found in contempt of court.

Ebonique Minor: While presiding over Ms. Minor's criminal case, Respondent made inappropriate, discourteous, and injudicious comments. While discussing the facts of the case, Ms. Minor said the other woman involved in a fight, whom she did not know, "was dancing and she was talking noise and all that stuff" to Ms. Minor and her friends. Respondent said to Ms. Minor: "Oh, she was booting it up on you?" After Respondent asked Ms. Minor about "booting it up," the audience began laughing. According to Respondent and other witnesses, "booting it up" is a slang term for someone trying to provoke a fight with another individual.

In his judicial misconduct hearing, Respondent acknowledged the combination of him saying "booting it up" as well as the defendant's attempt to demonstrate what happened may have provided some "comic relief." At a different point during the hearing, Respondent claimed just the defendant's demonstration provoked laughter from the audience. Respondent explained that he said "booting it up" because he wanted the defendant, Ms. Minor, to understand that he knew what she was talking about.

LeShay Wilson: While presiding over Ms. Wilson's criminal case, Respondent made repeated inappropriate comments, such as: "He was living with you but he was shacking up with her? ... he was living with you but laying with her, right? ... She going see my man ... And you say, oh, but no, that ain't happening like that? You got mad about it, didn't you?" According to the OSC, these comments were unnecessary, demeaning, and displayed a lack of decorum. In addition, the OSC alleged Respondent also failed to maintain order and decorum during this proceeding, including allowing Ms. Wilson and a witness to argue and talk over one another, requiring the bailiff to call for order on multiple occasions.

44

In his post-hearing brief, Respondent asserted his quotes were taken out of context. He argued his questions were only asked after the defendant and the victim used slang to describe their relationship with a third person. The certified transcript contains many instances where the court reporter was unable to discern what was being said. This includes thirteen instances of the defendant and the victim speaking over each other, five instances of the court reporter noting "noise" or "laughter" from the audience, and one instance of the defendant speaking over Respondent. At one point, Respondent jokingly asks his court reporter to read back what was said, to which the court reporter replied, on an open microphone and presumably so everyone could hear, "I can't possibly."

During the hearing and in his post-hearing brief, Respondent maintained he had control over the hearing the entire time. Respondent explained he allowed the victim and the defendant to "air out their grievance and be finished...and go on about their business..." In addition, Respondent said the exchange allowed him to fashion an appropriate remedy for the defendant.

In his brief to the Commission and at his appearance before the Commission, Respondent apologized *if* his use of slang and facetious language and otherwise unnecessary comments "has either personally offended anyone or offended the dignity of the proceedings in his courtroom." He explained it was never his intention to be disrespectful of women who are abused. In his brief to this court, Respondent offers his clear, unequivocal, unconditional, and heartfelt apology for his language and his use of slang. He states it was never his intent to offer a conditional apology and, if there has been any confusion in this regard by the use of the word "if," blame should be placed on his counsel. As far as the use of slang in the courtroom and as far as the facetious comments made, Respondent stated:

45

> I realize now it's my words that give the people the – the ability to put on them the interpretation they want to and that if I'm more careful in the selection of my words, that opportunity will not be presented again.
>
> I apologize for the use of slang in court. ... It was never intended to be degrading. It was never intended to be a mockery. ... [W]hat I say is not by way of excuse. It's by way of explanation. I don't – I make no excuse for it.

Respondent assured the Commission, as he does this court, that he has modified his conduct and has ceased using slang and making unnecessary comments.

*Conclusions of Fact*

The Commission voted to adopt the proposed conclusions of fact made by the Hearing Officer regarding Amended Count Four. Given his many years of experience as a district judge, Respondent may have had legitimate concerns about domestic abuse statutes crafted by the Legislature and how they can be manipulated by both victims and perpetrators of domestic violence. Nevertheless, the Commission found the manner in which he chose to voice his concerns was wholly inappropriate, distasteful, and reflects poorly on the judiciary as a whole. In the case of Christopher Williams, the Commission found Respondent's claim that he was "seriously inquiring" whether the victim was alive was absurd given his years of experience on the court. Instead, the Commission found, his comments should be interpreted as Respondent using the defendant's arraignment as his opportunity to muse about the merits of a relatively new crime (domestic abuse by strangulation). Thus it was not a coincidence Respondent also discussed choking in the case of Travis Braxton. Rather, Respondent admitted this was a continuation of his concerns about the practical implications of certain statutes. While Respondent says he intended for his comments to be heard only by the Assistant District Attorney, the comments were still heard by at least people in front of the

46

courtroom, were picked up on the microphone, and included in the official transcript.

In the case of McKinley Thompson, the Commission found Respondent reached a low point when he used a domestic abuse victim to continue his questions about domestic abuse statutes. Ms. Thompson does not allege that she was choked by her husband, and yet she was asked whether she was choked – twice. When Ms. Thompson says that her husband "hit" her, Respondent replies, "He didn't beat you, though. What's the difference? It's more than one hit that takes a ... beating." Respondent's explanation that he was merely assessing the severity of the abuse makes sense only in a vacuum, the Commission found. Instead, it should be viewed in its proper context – Respondent's comments were likely a part of a pattern of making distasteful remarks and asking unnecessary questions to make a broader point about domestic abuse statutes crafted by the Legislature.

The Commission nevertheless found it is unnecessary to determine exactly why Respondent decided to ask unnecessary questions and make inappropriate comments. The record established by a clear and convincing standard that Respondent made these comments, that they served no legitimate purpose, and that they in no way enhanced the administration of justice.

Respondent has admitted to using slang and colloquialisms when communicating with individuals appearing before him. The Commission found these informal comments, combined with Respondent's informal manner of speech, left the unmistakable impression that Respondent's courtroom is an informal environment. Such informality, the Commission found, has on occasion led to outright chaos, as in the case of LeShay Wilson. The Commission dismissed as dubious Respondent's claim that he remained in control of the courtroom the

47

entire time, because the court recording contradicted that claim and makes a mockery of his defense. Even a reading of the transcript, the Commission found, without the benefit of listening to the audio recording, shows a courtroom lacking in basic decorum. Our review of the record supports the Commission's findings.

*Conclusions of Law*

Respondent now concedes his conduct violated the Code of Judicial Conduct. The Hearing Officer found Respondent violated Canon 3A(2) by failing to maintain decorum in his courtroom and Canon 3A(3) by failing to act in a dignified manner to litigants. The Hearing Officer found Respondent's use of slang, inappropriate and unnecessary comments, and overall lack of demeanor gave the impression that he finds domestic violence cases to be frivolous and contributed to an atmosphere where audience participation seemed to be encouraged and the proceedings extraordinarily undignified. The Hearing Officer also found his conduct violated Canons 1 and 2A of the Code of Judicial Conduct. The Hearing Officer found, given Respondent's experience and his adamant refusal to acknowledge that his conduct failed to promote the dignity of the court, he engaged in willful misconduct relating to his official duty and engaged in persistent and public conduct prejudicial to the administration of justice that brings the office into disrepute in violation of La. Const. art. V, § 25(C).

Respondent did acknowledge these violations in post-hearing proceedings before the Commission. As he does in this court, Respondent took issue with the Hearing Officer's conclusion regarding his "adamant refusal to acknowledge that his conduct failed to promote the dignity of the court," and requested the Commission reject the Hearing Officer's conclusion in this regard. The Commission, however, agreed with the Hearing Officer's assessment. By initially

48

refusing to acknowledge that his conduct as alleged in Amended Count Four was ethically improper, Respondent, the Commission found, did refuse to acknowledge before the Hearing Officer that his conduct failed to promote the dignity of the court. The Commission found it should not have taken the formality of a hearing in front of a hearing officer for Respondent to belatedly realize this. Moreover, the Hearing Officer found (and the Commission agreed) that many of the defenses Respondent asserted before the Hearing Officer related to Amended Count Four were "absurd," "ma[de] sense only in a vacuum," and, with respect to the LeShay Wilson case, that "the recording easily contradicts his claim and makes a mockery of his defense." Finally, the Commission found Respondent's apologies regarding his conduct in his Answer to Amended Count Four and at the hearing before the Hearing Officer did not constitute a recognition that he failed to promote the dignity of the court, as such apologies were either qualified ("if his comments have been viewed and interpreted that way by the Commission, Respondent apologizes") or accompanied with a denial that he made insensitive, discourteous, and injudicious comments. In his brief to this court, Respondent strongly disagrees with the Commission's findings that he has not recognized the error of his ways and that he has not fully and sincerely apologized.

In sum, we agree with the Commission, and Respondent concedes, that his conduct in using slang and informal colloquialisms, resulting in the loss of dignity to the judiciary, violated Canons 1, 2A, 3A(2), and 3A(3), and that he engaged in persistent and public conduct prejudicial to the administration of justice that brings the judicial office in disrepute in violation of La. Const. art. V, § 25(C).

**SANCTION**

49

In judicial discipline cases, this court applies the factors set forth in *In re: Chaisson*, 549 So. 2d 259 (La. 1989),[21] to determine an appropriate sanction. Respondent concedes the charges in part of Count 1 and Amended Count 4 were proven by clear and convincing evidence subjecting him to discipline. Though he disputed the Commission's findings with regard to part of Count 1, Count 2 and Amended Count 3, we find those charges were also proven by clear and convincing evidence subjecting Respondent to discipline. The Commission considered the *Chaisson* factors and recommended Respondent be suspended without pay for one year. We accept the Commission's reasoning, as well as its recommendation of a one year suspension.

We first consider whether Respondent's misconduct was an isolated instance or evidences a pattern of conduct, and consider the nature, extent, and frequency of the acts of misconduct. We agree with the Commission that Respondent's misconduct is serious, not isolated, and evidences a pattern of improper comments, injudicious behavior, and failure to follow the law. In Count One, the Commission found Respondent made improper comments about a pending case to the District Attorney and the victims' families outside of the presence of the defendant and defendant's counsel, which caused one family member to believe the criminal trial would end in a mistrial. In Count Two and Amended Count Three, the

---

[21] In *Chaisson*, this court, citing *Matter of Deming*, 108 Wash.2d 82, 736 P.2d 639, 659 (1987), set forth a non-exclusive list of factors a court may consider in imposing discipline on a judge:

> (a) whether the misconduct is an isolated instance or evidenced a pattern of conduct; (b) the nature, extent and frequency of occurrence of the acts of misconduct; (c) whether the misconduct occurred in or out of the courtroom; (d) whether the misconduct occurred in the judge's official capacity or in his private life; (e) whether the judge has acknowledged or recognized that the acts occurred; (f) whether the judge has evidenced an effort to change or modify his conduct; (g) the length of service on the bench; (h) whether there have been prior complaints about this judge; (i) the effect the misconduct has upon the integrity of and respect for the judiciary; and (j) the extent to which the judge exploited his position to satisfy his personal desires.

Commission found Respondent had a practice of failing to follow the law for holding persons in direct contempt of court, including failing to give them an opportunity to speak by way of defense or mitigation before holding them in contempt (and, in some cases, sentencing them to a term of imprisonment). Moreover, Respondent held one individual in contempt of court and sentenced him to a term of imprisonment for conduct that was not contemptuous, without giving him any opportunity whatsoever to defend himself against the charge of contempt. In Amended Count Four, the Commission found that, over the course of three separate days in his courtroom, Respondent failed to maintain appropriate courtroom decorum and engaged in a pattern of making inappropriate, distasteful, insensitive, and unnecessary comments that served no legitimate purpose and, in some instances, made a mockery of the proceedings.

We agree with the Commission that this conduct, especially when combined with Respondent's previous misconduct as discussed below, demonstrates a pattern of injudicious behavior and gives the impression Respondent either lacks a fundamental understanding regarding appropriate judicial temperament and demeanor or believes that maintaining appropriate judicial temperament and demeanor is unnecessary.[22]

We next consider whether the misconduct occurred in or out of the courtroom and whether the misconduct occurred in the judge's official capacity or in his private life. As the Commission found, Respondent's misconduct occurred while he was acting in his official capacity as a district court judge. Respondent's misconduct as found in Count Two, Amended Court Three, and Amended Count Four all occurred in open court. Respondent's misconduct as discussed in Count

_____

[22] As the Commission pointed out, Respondent's failure to follow the proper procedure for holding a person in contempt of court relates to temperament and demeanor, because his practice was to act first (*i.e.*, hold someone in contempt and punish them therefore, including imposing a term of imprisonment in some cases) and then ask questions later, if at all.

51

One occurred outside of the courtroom, but inside the courthouse, and related to a case pending before him.

*Chaisson* also requires us to consider whether the judge has acknowledged or recognized that the acts occurred and whether the judge has evidenced an effort to change or modify his conduct. Respondent ultimately conceded his conduct with respect to part of Count One and all of Amended Count Four was ethically improper and apologized for such conduct. The Commission found, however, that Respondent did not come to this realization until after the Hearing Officer found Respondent had committed judicial misconduct with respect to these counts. We agree with Respondent that he may exercise his right to defend himself against the allegations in the Formal Charge. Still, the Commission believed it should not have taken the formality of a hearing in front of a hearing officer for Respondent to realize his comments during court and during a meeting between the District Attorney's Office and the victims' families were improper. Especially with respect to Amended Count Four, the Commission found that many of the defenses Respondent asserted to explain his in-court comments were absurd and wholly without merit and that his apologies regarding such comments were qualified and not unconditional. Accordingly, the Commission found that Respondent largely failed to accept responsibility for his conduct and demonstrated a lack of appreciation for the seriousness of his actions.

Likewise, Respondent conveyed to the Commission that he has ceased using slang in his courtroom and making unnecessary comments and that he now strictly follows the proper procedures for holding someone in contempt of court. Although the Commission appreciated Respondent's corrective measures in this regard, the Commission found that a judge as experienced as Respondent either knew better or should have known better and should have taken corrective action long ago.

Moreover, the Commission was unconvinced that Respondent's specific corrective measures will address the larger issue – his pattern of injudicious behavior and his apparent inability or lack of desire to maintain an appropriate judicial temperament and demeanor.[23] In the Conclusion to his Proposed Findings of Fact and Conclusions of Law, the Hearing Officer concluded: "[G]iven Respondent's experience on the bench which at the time of the alleged offense was at least 14 years, there is plenty of evidence that Respondent's conduct was willful – that is, the produc[t] of his decision to willfully and knowingly ignore the Code of Judicial Conduct and his judicial duties." Accordingly, the Commission found Respondent's belated apologies for his conduct and his promises to do better in the future to ring hollow.

In his brief to this court, Respondent strongly contests the Commission's reasoning and asserts the Commission's assessment is simply wrong. Respondent contends he has not denied that certain acts or events occurred. He has merely provided explanations, particularly with regard to Amended Count 4, to demonstrate his intent and purpose for what he said and did. Respondent contends he has admitted most, if not all salient facts, and maintains that he has the right to dispute or explain his conduct, intentions, and motivation, even in those circumstances where he admittedly violated the Code of Judicial Conduct, such as in Count 1 and Amended Count 4. He maintains he has the right to contest whether or not he engaged in legal error subject to discipline.

We do not disagree that Respondent may vigorously exercise his right to mount a defense to the charges alleged in a disciplinary proceeding. But, as the Commission recognized, the record reveals that Respondent's appreciation of the

---

[23] The Hearing Officer found the undignified behavior and general indecorous atmosphere in Respondent's court leads one to believe that he has been tolerant of this type of environment for a very long time.

depth and extent of his misconduct has evolved rather slowly over the course of the proceedings. We find the Commission's lack of confidence in Respondent's self-rehabilitation not unfounded. That said, however, we do believe Respondent has, albeit belatedly, now demonstrated his sincerity in changing or modifying his conduct and court procedures to prevent future legal errors and to maintain decorum and dignity in his courtroom.

We next look at the length of service on the bench. Respondent has held judicial office continuously since January 1, 1997. At the time these matters arose in 2011 and 2012, Respondent was not a new judge and, as the Commission found, should have been very familiar with his ethical obligations pursuant to the Code of Judicial Conduct and the Louisiana Constitution.

We next consider whether there have been prior complaints. In Respondent's case, there have been a number of prior substantiated complaints against him. We agree with the Commission that these other complaints demonstrate a distressing pattern of injudicious behavior.

Most recently, in *In re: Free*, 14-1828 (La. 12/9/14), 158 So. 3d 771, this court suspended Respondent from office for thirty days without pay for (1) engaging in improper *ex parte* communications with a party in an environmental contamination class action lawsuit in response to a request for his recusal and attempting to resolve the matter during such communications; and (2) accepting an invitation to participate in an all-expenses-paid trip on a private jet to a hunting ranch in Texas, extended to him by attorneys in a personal injury case before him at or near the time of settlement negotiations, including an attorney who regularly tries cases in his court, which trip occurred shortly after the trial was concluded. Although the Commission found it very troubling that Respondent comes again before the Commission and the court, Respondent asserts the instant conduct

54

primarily occurred in 2011, well before his appearance before this court in 2014 concerning conduct occurring in 2009 and 2010.

In 2005, Respondent was admonished by the Commission in File No. 03-3740 for engaging in impermissible *ex parte* communications while issuing arrest warrants. In the letter of admonishment, Respondent was advised that his practice of routinely determining from plaintiff's counsel in child support cases the amount of any alleged child support arrearage when issuing a warrant for failure to appear so that he could set the bond in the amount of the arrearage was an impermissible *ex parte* communication.

In 2005, Respondent was cautioned by the Commission in File No. 03-3364, concerning allegations that he was biased in favor of the complainant's opposing counsel and appointed a political ally *ex parte* as a temporary liquidator. The closure letter cautioned Respondent that Canon 3B(4) prohibits a judge from making unnecessary appointments and directs that a judge should avoid appointments that tend to create an appearance of impropriety.

In 2001, Respondent signed a Deferred Recommendation of Discipline Agreement (DRDA) with the Commission to resolve two Formal Charges against him. Formal Charge No. 131 concerned allegations by a criminal defendant that Respondent failed to recuse himself having previously prosecuted the defendant when Respondent was an Assistant District Attorney. Formal Charge 130 involved allegations that Respondent presided over a criminal case in which a former client from his private practice who owed him attorney fees from such representation was involved. As part of the DRDA, Respondent was admonished for his failure to recuse in one case, and further admonished for accepting past due attorney fees earned by him prior to taking the bench and then "unrecusing" himself from the defendant's case.

55

In 2000, Respondent was cautioned by the Commission in File No. 99-1611 to discourage *ex parte* communications to the extent possible and that, under Canon 3B(2), actions of his staff may be attributed to him.

In 1998, Respondent was cautioned by the Commission in File No. 98-1062 to obey applicable statutes in establishing child visitation and to remain mindful of Canon 3A(3), which mandates that a judge be patient, dignified, and courteous to litigants and others with whom the judge deals in an official capacity.

Under *Chaisson*, we must next consider the effect the Respondent's misconduct has had upon the integrity of and respect for the judiciary. The Commission found that Respondent's actions have certainly caused members of the public to lose respect for the judiciary and to question its integrity and impartiality. With respect to Amended Count Four especially, the Commission cited Respondent's use of slang, inappropriate and unnecessary comments, and overall lack of demeanor as giving the "impression that Respondent finds domestic violence cases to be frivolous" and "contributed to an atmosphere ... where the audience participation seemed to be encouraged and the proceedings extraordinarily undignified." The Commission found such an atmosphere to be wholly inappropriate for any court in the State of Louisiana.

With respect to Count One, Respondent's inappropriate comments to the District Attorney and the victims' families caused at least one of the family members to believe the criminal trial would end in a mistrial. With respect to Count Two and Amended Court Three, Respondent's conduct in sentencing Mr. Owens to a term of imprisonment for conduct that was not contemptuous and in failing to give persons charged with contempt an opportunity to speak before being held in contempt gives the impression of an intemperate judge who acts first and asks questions later, if at all. Respondent's failure to follow the proper contempt

56

procedures even when sentencing persons to jail for contempt suggested to the Commission that he does not consider the deprivation of a person's liberty to be so serious as to require strict adherence to the procedures by which that liberty may lawfully be deprived.

Finally, there is no evidence Respondent used his position to satisfy his personal desires, other than perhaps his desire to entertain himself by making inappropriate comments and by allowing raucous, undignified courtroom proceedings.

After considering the *Chaisson* factors, some of which may be regarded as aggravating and some as mitigating, the Commission recommended Respondent be suspended without pay for one year. We, too, have considered those factors, and after reviewing the record agree that a one-year suspension without pay is appropriate in this case. We also accept the Commission's recommendation that Respondent be ordered to reimburse and pay to the Commission $11,098.68 in hard costs.

**DECREE**

Upon review of the findings and recommendations of the Judiciary Commission, and considering the record filed herein, we find the record establishes by clear and convincing evidence that Respondent violated Canons 1, 2, 2A, 3A(1), 3A(2), 3A(3), and 3C of the Code of Judicial Conduct, as well as La. Const. art. V, § 25(C). Based on our review of the *Chaisson* factors and the law applicable to this case, we find Respondent's misconduct justifies the recommended sanction of suspension for one year without pay. Accordingly, it is hereby ordered that Judge J. Robin Free of the 18th Judicial District Court for the Parishes of Iberville, Pointe Coupee and West Baton Rouge, be suspended for a period of one year without pay. Judge Free is further cast with costs of this proceeding, and shall pay

to the Judiciary Commission the sum of $11,098.68 as reimbursement for expenses incurred by the Commission during its investigation and prosecution of this case, pursuant to Supreme Court Rule XXIII, § 22.

**SUSPENSION ORDERED**

# SUPREME COURT OF LOUISIANA

## NO. 2016-O-0434

### IN RE: JUDGE J. ROBIN FREE,
### EIGHTEENTH JUDICIAL DISTRICT COURT,
### PARISHES OF WEST BATON ROUGE, IBERVILLE,
### AND POINTE COUPEE, STATE OF LOUISIANA

*JUDICIARY COMMISSION OF LOUISIANA*

**WEIMER, J.**, dissenting in part.

I agree with the majority's findings that Judge Free engaged in judicial misconduct in violation of the Code of Judicial Conduct and the Louisiana Constitution. Indeed, Judge Free has acknowledged some of his behavior fell short of what is expected of a judge and accepts he will be disciplined. However, for the following reasons, I respectfully dissent from the discipline imposed.

The fact that one offers an explanation for misconduct does not preclude a showing and finding of remorse and cooperation. See **In re Sims**, 14-2515 p. 18 (La. 3/17/15), 159 So. 3d 1040, 1052. Judge Free has admitted and acknowledged error, particularly in his comments on the legal elements of domestic violence charges and his use of contempt procedures. As the majority recognized, Judge Free has

"demonstrated … sincerity in changing or modifying his conduct."[1] **In re Free**, 16-0434 (La. _/_/16), slip op. at 54.

Mindful that the "primary purpose of the Code of Judicial Conduct is to protect the public rather than to discipline judges,"[2] I believe suspension without pay of a shorter duration would adequately serve the purpose of judicial discipline. See, e.g., **In re Fuselier**, 02-1661 (La. 1/28/03), 837 So.2d 1257.[3] Judge Free's misconduct is more comparable to the misconduct in **In re Fuselier** than to those cases that resulted in the imposition of a one-year suspension. See, e.g., **In re Boothe**, 12-1821 (La.

---

[1] Before the Judiciary Commission, Judge Free stated:

> It appears … that for lack of better words, running my mouth has gotten me in trouble to the extent that in these domestic violence cases that I could even give the appearance about disrespect of women who are abused, I apologize for that. That was never my intention. It's not what I stand for. It's not who I am.
>
> As far as the use of slang in the courtroom and as far as the facetious comments made, I realize now it's my words that give the people the - the ability to put on them the interpretation they want to and that if I'm more careful in the selection of my words, that opportunity will not be presented again.
>
> I apologize for the use of slang in court. Whether it was an attempt to communicate, it was never intended to be mimicking. It was never intended to be degrading. It was never intended to be a mockery. And again, as I said earlier, because I do want the Commission members to believe this, what I say is not by way of excuse. It's by way of explanation. I don't-I make no excuse for it. I deal with it and I have to live with it. And I understand that.
>
> What I've told the Commission today, I mean it, that I've taken many steps to completely revamp or change the way I do things in court. … I've invited [the members of the Commission] to just randomly for the last few years just pull anyone you want, just pick a day, and you'll see that I've gotten much shorter and definitely much - much more attentive of each word I say because I now understand how each word can be looked at and how each word can be used and misinterpreted. And I don't want that ever to happen to me again.

[2] **In re Marullo**, 96-2222, p. 6 (La. 4/8/97), 692 So.2d 1019, 1023.

[3] **In In re Fuselier**, a 120-day suspension was found to be appropriate for a seasoned judge who: (1) held a witness in contempt for failure to appear in court pursuant to a subpoena, even though the witness had not been properly subpoenaed; (2) contacted and met with the witness's employer, which ultimately led to the termination of the witness's employment, (3) abused his judicial authority by conducting arraignments and accepting guilty pleas in criminal cases in the absence of a prosecutor and by dismissing misdemeanor traffic cases without involving the prosecutor, (4) engaged in impermissible ex parte communications by "fixing" traffic tickets and/or other offenses, and (5) abused his constitutional judicial authority by "instituting, authorizing, and participating in" the worthless check program. *Id.* 02-161 at 6-33, 837 So.2d at 1262-79.

1/29/13), 110 So.3d 1002.[4] Accordingly, consistency in sanctioning suggests that the one-year suspension imposed by the majority is overly punitive in nature and that a lesser sanction is warranted under the facts of this case, particularly since the charges in this case do not involve misconduct that occurred following the sanction imposed in the prior case of **In re Free**, 14-1828 (La. 12/9/14), 158 So.3d 771.[5]

For these reasons, I respectfully dissent from the sanction imposed by the majority.

---

[4] Judge Boothe was suspended for one year without pay for, among other misconduct, (1)failing to recuse himself from hearing a defendant's motion for resentencing once it became clear that the defendant was going to make allegations against another judge who allegedly did not get along with Judge Boothe that would benefit Judge Boothe by exonerating Judge Boothe from previous allegations that the defendant had made against Judge Boothe and implicating other judge in a conspiracy, and (2) engaging in impermissible ex parte communications with the defendant. See **In re Boothe**, 12-1821 at 28-34, 110 So.3d at 1020-24.

[5] The behavior currently before this court occurred both before and after the behavior for which Judge Free was previously sanctioned, but none of this behavior occurred after the discipline was imposed in 2014.

**SUPREME COURT OF LOUISIANA**

**NO. 2016-O-0434**

**IN RE:  JUDGE ROBIN FREE,
EIGHTEENTH JUDICIAL DISTRICT COURT,
PARISHES OF WEST BATON ROUGE, IBERVILLE,
AND POINTE COUPEE, STATE OF LOUISIANA**

*JUDICIARY COMMISSION OF LOUISIANA*

CLARK, J., dissenting in part.

I agree with the majority that Judge Free's misconduct violated the Code of Judicial Conduct and the Louisiana Constitution, but would impose a lesser sanction.